Charles **KEEBLE**, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 17730.

United States Court of Appeals Eighth Circuit.

July 9, 1965.

Rehearing Denied Aug. 16, 1965.

952

Raymond A. Bruntrager, of Stewart & Bruntrager, St. Louis, Mo., for appellant.

Stephen H. Gilmore, Asst. U. S. Atty., St. Louis, Mo., Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo., for appellee.

Before VAN OOSTERHOUT and RIDGE, Circuit Judges, and HENLEY, District Judge.

HENLEY, District Judge.

This is an appeal from a conviction of the crime of perjury. The one count indictment charged in substance that on or about October 5, 1962, at Ellington, Reynolds County, Missouri, in the Southeastern Division of the Eastern District of that State, appellant, Charles Keeble, willfully gave false testimony as to a material matter in the course of a hearing being conducted by a Trial Examiner of the National Labor Relations Board in violation of 18 U.S.C.A. § 1621. The case was tried to a jury which found appellant guilty. A motion for a new trial was denied, and appellant was sentenced to the custody of the Attorney General for a period of thirty months. This appeal followed.

The record reflects that on May 9, 1962, appellant was secretary-treasurer of Local 916 of the International Hod Carriers and Common Laborers Union of America. That Union was involved in a dispute with Owen Langston, a contractor who was performing work in the vicinity of Ellington, and on the date just mentioned about 8 o'clock in the morning the dispute between Langston and the Union erupted into violence.

Subsequently, Langston filed an unfair labor practice complaint against the Union with the National Labor Relations Board. The complaint was investigated, and a hearing before Trial Examiner Eugene Dixon was held at Ellington on October 5, 1962, the date of appellant's alleged offense.

In the course of the hearing it became material to inquire whether appellant was at the scene of the disturbance on May 9 while it was going on. He testified under oath that he was not present at the time but was in fact several miles away at the Taum Sauk Dam Project.

It is this testimony which the indictment charged was false and perjurious.

The evidence produced in the course of the trial was in sharp conflict, and appellant does not contend that it was insufficient to sustain the verdict. For reversal appellant contends that error was committed in the reception of a certain item of documentary evidence; that the trial judge in the presence of the jury misquoted the testimony of a certain witness, and that the alleged misquotation, while inadvertent, was prejudicial to appellant; and that the closing argument of the Assistant United States Attorney was so improper and prejudicial as to call for a reversal.

As part of its case in chief the Government offered in evidence and the trial court admitted over the objection of appellant a "Visitors Log" maintained at the Taum Sauk Project for May 9, 1962. The bottom three lines of the first sheet of that exhibit reflect that on May 9, three men, including appellant, were admitted to the project area at 10:40 A.M., which was substantially later than the time at which the disturbance involving Langston and the Union had taken place. The exhibit indicates that the three men who entered were Arley Weekley, a carpenter, a Mr. Wilson, a Union representative, and appellant, who was also described as a Union representative. The exhibit reflects that appellant and Wilson left the project at 12:30 P.M.

As foundation for the introduction of the log, the Government called as witnesses John E. Barker, the Project Manager of the Taum Sauk Project, and Everett Crawford, a guard who was on duty at the main gate of the Project from 6:00 A.M. to 2:00 P.M. on May 9, and who actually made the log entries reflecting the arrival and departure of appellant.

The gist of the testimony of Mr. Barker was that the log was kept in the regular course of the contractor's business, that the entries were made by the guard on duty at the main gate, that at the close of each day the log would be turned over to one Palmer who was in charge of personnel and security at the Project, and that subsequently Palmer would turn the logs over to the witness for filing and safekeeping. Mr. Barker produced the log in question in obedience to a subpoena duces tecum.

Mr. Crawford testified that he was on duty during the period above stated, and that he made the entries in the log showing the admission of Weekley, Wilson, and appellant at 10:40 A.M. On cross-examination Crawford admitted he had no personal recollection of the events reflected by the log; that at times there would be some time lapse between a visitor's entering the Project and the recording of the entrance and time thereof on the log. He was shown a statement which he had given prior to the trial in which he stated that the lapse might be as much as an hour or two, but in his testimony he insisted that it would not have been that long. He was shown certain erasures appearing on the line immediately above the one on which appellant's name appeared and was unable to explain them. He admitted that it was possible that appellant entered the Project at least somewhat earlier than the time shown in the log.

The log was offered for the purpose of proving that appellant entered the Project at 10:40 A.M. on May 9 and not at some earlier hour. The log was, of course, hearsay, and appellant objected to its admission on that basis.

In support of its contention that the log was admissible the Government relies on the Federal Business Records Act, as amended, 28 U.S.C.A. § 1732(a). That statute is as follows:

"§ 1732. Record made in regular course of business; photographic copies.

"(a) In any court of the United States and in any court established by Act of Congress, any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evi-

dence of such act, transaction, occurrence, or event, if made in regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence, or event or within a reasonable time thereafter.

"All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but such circumstances shall not affect its admissibility.

"The term 'business,' as used in this section, includes business, profession, occupation, and calling of every kind."

Appellant argues that the log is not such a document as falls within the terms of the statute and, further, that in any event the concessions of Crawford in the course of his cross-examination so impugned the reliability of the log as to render it inadmissible. We do not agree.

That the log consists of a series of "business entries" and falls within the scope of the statute seems clear. The contractors on the Taum Sauk Project had a legitimate interest in recording visits to the Project and in knowing when visitors entered and left the premises, and according to the testimony of Barker and Crawford those records were kept regularly and as part of the contractors' regular routine of business. That the contractors may have been more interested in knowing who came and went than in knowing when they came and went is not material. See Finnegan v. United States, 8 Cir., 204 F.2d 105; United States v. Moran, 2 Cir., 151 F.2d 661, 167 A.L.R. 403; United States v. General Motors Corporation, 7 Cir., 121 F.2d 376.

Viewing the testimony of Crawford on cross-examination in the light most favorable to appellant, we think that his concessions about the log entries which have been mentioned simply went to the weight to be given to the log rather than to its admissibility. Cf. Thomas v. Hogan, 4 Cir., 308 F.2d 355; LaPorte v. United States, 9 Cir., 300 F.2d 878; United States v. Kimmel, 2 Cir., 274 F.2d 54.

Hence, we conclude that the trial court acted properly in admitting the log for whatever it might be worth in the eyes of the jury as triers of the facts.

In undertaking to establish that appellant was present at the scene of the disturbance while the violence was taking place the Government relied rather heavily on the testimony of one Freddy Pyrtle, and his testimony occupies 51 pages of the transcript before us. Pyrtle was subjected to direct and cross-examination; he was on redirect twice and on recross three times.

In the course of the proceedings it developed that prior to the hearing before the Trial Examiner Pyrtle had made an affidavit putting appellant at the scene of the violence. At the hearing, however, Pyrtle testified directly to the contrary, but in the course of the trial in the District Court he returned to his original story. He undertook to explain his testimony before the Trial Examiner by saying that he gave it after having been threatened by a Union member.

Counsel for the defendant understandably undertook to undermine Pyrtle's credibility by laying emphasis on his changes of story, and in connection with the alleged threat undertook to show that the threat, if there was one, was made before Pyrtle made his original affidavit, and, therefore, could not have affected his contrary testimony before the Trial Examiner.

At several points in the cross-examination Pyrtle conceded that he received the threat before he made the affidavit. However, on redirect he was asked certain questions and gave certain answers which might or might not be interpreted as statements that the affidavit was made before the threat was received. Those questions and answers were:

"Q. Now, was that the threat to you that was made by Wilson after

the affidavit and before the hearing? In other words, was that done before you went down to Ellington to testify?

"A. Yes, sir.

"Q. Was it after you saw those men out at the house with that affidavit?

"A. No, sir."

On recross-examination counsel for the defendant returned to the subject, and the following question was asked and the following colloquy between Court and counsel took place in the jury's presence:

"By Mr. Bruntrager: Q. You said a moment ago that threat had been made after the affidavit, I am sorry, before the affidavit. Pardon me.

"The Court: He said he made it after.

"Mr. Bruntrager: That wasn't the way I recall it.

"The Court: The jury will have to recall the testimony. As I recall it, that is what he has told you every time in response to all questions.

"Mr. Bruntrager: It wouldn't have been cross-examination. I think he could check the record to be sure, Judge. At least that is what he said to me. He did say something different to Mr. Gilmore.

"The Court: It won't take you very long to go back. Go right on back and see it yourself. It is just before the cross-examination. It is up to the jury to remember it. As my notes show it, that is what he said. The jurors have to keep up with the testimony themselves.

"Mr. Bruntrager: Could we go back?

"The Court: You can go back if you want to go back, if you can find it.

"Mr. Bruntrager: Oh, that's all right. We can go on."

■ As indicated, appellant now contends that the Court misquoted the testimony of Pyrtle, and that the misquota-

tion was prejudicial. We find the contention to be without merit.

It is not at all clear that there was any misquotation by the Court. Assuming *arguendo*, however, that there was a misquotation, we are convinced that no prejudice resulted therefrom. It was already clear to the jury that the testimony of Pyrtle at the trial conflicted with his testimony before the Trial Examiner, and that his testimony before the Examiner conflicted with his earlier affidavit. Also, as noted, Pyrtle had said in the course of the trial that he had made the affidavit after he had received the threat. In going back to the subject counsel was simply undertaking to cover ground which he had plowed already.

In a criminal case it is ultimately the duty of the jury to recall the testimony of the witnesses correctly as the trial judge twice stated in the course of the colloquy which has been quoted. Further, counsel for the defendant was given ample opportunity to have the court reporter review his notes so that it might be ascertained exactly what Pyrtle had said. Counsel did not avail himself of that opportunity and elected not to pursue the matter further. When he did so, we think that he waived any right to complain of the Court's misstatement of the testimony, if there was such a misstatement.

In the course of his final argument the Assistant United States Attorney who was trying the case for the Government undertook to bolster the credibility of Pyrtle and to a lesser extent that of Langston by stating in effect that he personally believed that they were telling the truth and by indicating, at least to some extent, that his belief was based on knowledge of facts which had not been proven in evidence. On several occasions in the course of the argument counsel for the defendant objected to the statements that were being made.

■ We say without hesitation that the portions of the Government's argument under consideration were improper. While a federal prosecutor should present and argue his cause with vigor, he

should not permit his zeal to carry him beyond the bounds of fair play. He should not in general indicate to the jury that he has a personal belief, apart from his interpretation of the evidence, that a defendant is guilty or that the Government witnesses have told the truth, and he certainly should not say or suggest to the jury that his belief is bottomed on a knowledge of facts which for some reason he has not or could not prove by competent evidence. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; Taliaferro v. United States, 9 Cir., 47 F.2d 699.

On the other hand, not every impropriety of argument calls for a new trial or for a reversal of a judgment of conviction. And appellate courts should not reverse for such improprieties unless persuaded that they probably prejudiced the defendant and that the prejudice was not removed effectively by the trial judge before the submission of the case to the jury. See Koolish v. United States, 8 Cir., 340 F.2d 513; Cochran v. United States, 8 Cir., 310 F.2d 585; Blauner v. United States, 8 Cir., 293 F.2d 723; Neubauer v. United States, 8 Cir., 250 F.2d 838; Schmidt v. United States, 8 Cir., 237 F.2d 542.

The record discloses that each time counsel for the defendant objected to the argument of the Assistant United States Attorney the able and experienced trial judge promptly admonished the jury that they were limited in their consideration to the evidence in the case, and that they should judge the demeanor of witnesses by their own observations of them on the witness stand. The trial judge evidently felt that no further action was necessary on his part with respect to the Government's argument, and that was a matter which rested largely in his discretion. Cochran v. United States, supra, 310 F.2d 589.

While the assignment of error now being discussed has given us some concern, we are persuaded that on balance it cannot be said that any prejudice resulting from the closing argument was not removed by the admonitions of the

Court. To put it another way, we cannot say that the trial judge abused his discretion by not reprimanding the Assistant United States Attorney or declaring a mistrial. In the latter connection it is noted that appellant did not ask for a mistrial.

No error appearing the judgment of the District Court is affirmed.