Charles V. **TURNER**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 21443.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 4, 1968.

Decided June 3, 1969.

Petition for Rehearing Denied
July 10, 1969.

Mr. William J. Garber, Washington, D. C., for appellant.

Mr. David A. Clarke, Jr., Special Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty., at the time the brief was filed, and Harold J. Sullivan, Asst. U. S. Atty., were on the brief, for appellee.

Before FAHY, Senior Circuit Judge, and DANAHER * and McGOWAN, Circuit Judges.

DANAHER, Circuit Judge:

Four men on December 1, 1965 were involved in a robbery. This appellant and one Tyler were found guilty.[1] At gunpoint $3,300 had been taken from Giant Food Store employees whom the robbers rounded up and forcibly herded into a meat box. Both Turner and Tyler were identified by employees as well as by McFarland who testified further in detail as to the planning and execution of the robbery.

## I

Turner advances what he describes on brief as the "admittedly novel contention" that the trial judge should have conducted "a voir dire, outside the presence of the jury, concerning all of the surrounding circumstances of McFarland's testimony." Thus a determination could have been made as to whether McFarland had been coerced into testifying and his testimony before the grand jury could have been produced to ascertain his motivation. But there had been no motion for any such production, and McFarland's credibility had been thoroughly tested at trial.[2] The judge cautioned the jury as to its consideration of the testimony of a perjurer, an accomplice and informer. Clearly within the province of the jury lay its assessment of the credibility of each of the witnesses as well as of the weight, if any, to be accorded to the testimony of McFarland.[3]

## II

After verdict, and in support of a motion for a new trial, counsel for Tyler asserted that a juror, one Birckhead, informed him of comments by two women jurors indicating bias. Then joining in that motion, Turner's counsel, Tyler's attorney, a court stenographer and both convicted accused were present as the judge conducted a hearing in chambers. Birckhead was called as a witness.

He testified that after the trial, Tyler's attorney approached him and questioned him. Then Birckhead told his questioner that he had overheard a woman juror say she had read in a newspaper about "so and so," and something to the effect that "he" was a "bad one."

As the hearing went forward Birckhead could not identify the woman juror, he did not know what paper she had in

---

* Circuit Judge Danaher became Senior Circuit Judge on January 23, 1969.

1. One Flynn was found not guilty, and McFarland, an accomplice, testified for the Government at the trial in June, 1967. By that time McFarland had been imprisoned after conviction on another robbery charge.

2. Hoffa v. United States, 385 U.S. 293, 311, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); Laughlin v. United States, 128 U.S.App. D.C. 27, 33, 385 F.2d 287, 293 (1967), cert. denied, 390 U.S. 1003, 88 S.Ct. 1245, 20 L.Ed.2d 103 (1968).

3. Cf. Bush v. United States, 126 U.S.App. D.C. 174, 176, 375 F.2d 602, 604 (1967).

mind, or whether she had referred to a witness, a defendant or some other person.[4]

Each of the four women trial jurors denied knowledge of any such conversation as Birckhead so vaguely had attributed to one of them.

It has now, for the first time, been argued that the judge should have placed the respective jurors under oath and should have arranged a confrontation between Birckhead and the four women that possible bias might have been exposed.

Neither defense counsel voiced objection to the procedure adopted by the trial judge. Neither then raised a question as to the taking of unsworn testimony. Neither mentioned the lack of confrontation which now is said to have infected the course pursued, indeed the record shows that Tyler's counsel explained that Birckhead had to return to work and he was accordingly excused upon the conclusion of his testimony.

In this state of the record respecting such claims advanced for the first time, we find no error in the trial judge's denial of the motion for a new trial.

### III

■ Denying the motion for a new trial, n.o.v., the judge observed that juror Birckhead reported[5] his parents' home, many years earlier, had been entered but nothing had been taken.[6] "He made no disclosure at the time of voir dire because he did not think that this incident was relevant," the judge wrote.

In the exact context of the questions, Birckhead correctly interpreted the import of the inquiry, for these accused were to be tried for armed robbery—not for some breaking and entering. Birckhead's appraisal must have seemed appropriate to the trial judge who had presided over the pretrial voir dire as well as the post-trial hearing. He had conducted the full trial and thus was in position to assess the weight to be accorded to the circumstance, and there was ample basis for the view the trial judge decided to espouse.

Of course as a matter of hindsight, it might have been better for Birckhead to have responded literally in the first place that counsel might himself decide whether to accept or reject Birckhead as a juror. When such remote details became known, post-trial, the judge in deciding whether or not to grant the pending motion was bound to take into account: (1) whether Birckhead purposely had failed to answer or deliberately had concealed the facts; and if so, (2) whether there had emerged from that failure an imputation of such bias and prejudice as to require a new trial.[7]

Here the motion was denied, and implicit in the ruling was a finding that no significance was to be attached to the circumstance. Where the trial judge clearly was possessed of a grasp of the whole background, we find ourselves unable to say upon review that there was such an abuse of discretion as to require reversal.[8]

### IV

Finally, appellant here contends that the prosecutor's argument in rebuttal "was outside the evidence and was cal-

4. Appellant on brief describes his testimony as "equivocal."

5. Apparently the incident occurred at the hearing in chambers.

6. Prospective jurors on voir dire had been queried by one of defense counsel:
   I'd like to know if any members of the prospective jury panel have yourself been robbed.
   *   *   *   *   *
   Now, have any members of the prospective jury panel had close relatives of [*sic*] very close friends who have been robbed?

7. *Cf.* Ryan v. United States, 89 U.S.App. D.C. 328, 191 F.2d 779 (1951), cert. denied *sub nom.* Duncan v. United States, 342 U.S. 928, 72 S.Ct. 368, 96 L.Ed. 691 (1952).

8. *Id.; cf.* Somerville v. Capital Transit Co., 89 U.S.App.D.C. 349, 350, 192 F.2d 413, 414 (1951).

culated to appeal to the passions and prejudices of the jury." McFarland under cross examination by all defense counsel had admitted his criminal record, his current incarceration following conviction of robbery, his having acted as an informant against other criminals, and his participation as an accomplice in the instant crime. As might be expected, defense arguments in challenging his veracity made the most of his venality as the jury was asked to reject his testimony.

The prosecutor in closing endeavored to rehabilitate the witness and pointed out that criminals on occasion come forward and become witnesses for the prosecution. His argument recalled from McFarland's testimony how the robbery at issue had been planned, how alibis had been fabricated in advance, what routes the robbers had followed and details as to their division of the spoils. Such testimony could have been come by only from one of the participants, as the rebuttal argument had it. The prosecutor then observed that if some of the jurors had read Capote's book "In Cold Blood," they would know that the crime there depicted found solution when one of the accomplices came forward. Again and in like vein,[9] the prosecutor recalled that the whereabouts of the fugitive criminal Dillinger were disclosed to the authorities by one "within the criminal ranks."

The appellant here would have us say that such references inevitably led to his being prejudiced. We are not persuaded that the incident so transcended the bounds of legitimate argument as to require reversal. Actually, the remarks appear more unnecessary than regrettable when the Government's case in its entirety is viewed in retrospect. From time to time, our experience shows, the prosecutor will "over-prove" his case, and even in his zeal, assume the role of a witness, so to speak, and undertake in argument, to go beyond an outline of the facts and the inferences he wants a jury to draw from them. We have pointed out that "Absolute fairness is a counsel of perfection," but at the very least, a prosecutor should hold himself to the highest practicable standard of fairness.[10] Here, our adverse criticism does not amount to a conclusion that Turner's conviction turned in any significant degree upon the Government's closing argument.[11]

Had prompt objection been made,[12] we have no doubt the trial judge then would have instructed the jury that such references to matters outside the record were to have no place in the determination of guilt or innocence of the accused in this case.

In the course of his charge the trial judge instructed the jury thus:

> Now, ladies and gentlemen, the statements and arguments of counsel are not evidence. They are only intended to assist you in understanding the evidence and the contentions of the parties. Reference was made, for

9. There was no evidence that any juror had read the Capote book, or that any had knowledge of the Dillinger history.

For reference, *see* Austin v. United States, 127 U.S.App.D.C. 180, 188, 382 F.2d 129, 137 (1967), and *id.*, 127 U.S. App.D.C. at 200 n. 10, 382 F.2d at 149 n. 10.

10. McFarland v. United States, 80 U.S. App.D.C. 196, 197, 150 F.2d 593, 594 (1945).

11. *Cf.* Keeble v. United States, 347 F.2d 951, 956 (8 Cir. 1965); Fogarty v. United States, 263 F.2d 201, 204 (5 Cir. 1959); Padron v. United States, 254 F. 2d 574, 577 (5 Cir. 1958).

12. *Cf.* Fed.R.Crim.P. 30; Singer v. United States, 380 U.S. 24, 38, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965); Villaroman v. United States, 87 U.S.App.D.C. 240, 184 F.2d 261 (1950).

Not until the close of the argument was the incident noticed. Then Tyler's counsel moved for a mistrial. The motion was denied. As it obviously seemed to the trial judge, so it may have appeared to Turner's counsel (who voiced no objection at any time) that the references lacked other than illustrative significance. There was no effort to link the accused here with the characters mentioned.

instance, in the argument of the District Attorney to a certain book and a certain character of some thirty years ago, one Dillinger. That was mentioned solely for the purpose of illustrating that on occasion informers do come from former associates of persons charged with crime, that and nothing more.

██ Just as we have weighed carefully the impact of the allusions here challenged, we have taken into account the assessment of the trial judge.[13] His judgment cannot lightly be rejected. The evidence in this case in all other respects is so strong that the illustrations proffered by the prosecutor can have amounted to no more than had been recognized by the judge. Informers "do come forward" and testify as to criminal conduct on the part of their former associates. That is a matter of common knowledge.[14] The references indeed were illustrative, "that and nothing more," as the judge put it.

Affirmed.

FAHY, Senior Circuit Judge (dissenting):

To a very substantial degree testimony considered by the jury in convicting appellant was given by an accomplice. This witness at the time of testifying was actually serving a prison sentence for bank robbery. Moreover, on cross-examination he admitted that he made his living through robberies. In arguing the case to the jury the defense accordingly attacked the credibility of this witness. In responding to this attack the prosecuting attorney pointed to the difficulties in general of obtaining evidence of crime, and went on to say:

You get it from within.

Perhaps some of you read Truman Capote's book, *In Cold Blood*. He probably made a million dollars writing that story.

If you read the story you know that that vicious, horrendous crime would not have been solved but for an accomplice coming forward, someone who heard something, one from the criminal ranks coming up. The crime is solved.

If you go back a little bit farther in history, back into the early 30's, with John Dillinger—there is not one of you who doesn't remember the fact about Dillinger.

After he plagued the country for a long time, was a fugitive, the Bureau of Investigation trying to find him, he robbed another bank, he is locked up again, he escapes again, he kills a policeman in the city of Chicago.

But Dillinger can't be found. How do you find Dillinger? Only from someone from within the criminal ranks coming forward, the notorious lady in red.

She came forward, and you will recall she told the partner of the policeman who had been killed where Dillinger would be on a given night and as he came out of the theater and moved for his gun, he was killed.

Had he not been killed surely other policemen would have been killed and other banks would have been robbed.

But crimes, not just today, not the crime of December 1, 1965, but crimes throughout history are solved in large measure by the cooperation of some criminals who come forward.

At the conclusion of the arguments objection was made by counsel for ap-

---

13. *Cf.* Frazier v. Cupp, 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

14. See as a recent example the facts stated by Mr. Justice Fortas in Foster v. California, 394 U.S. 440, 89 S.Ct. 1127, 22 L.Ed.2d 402 (April 1, 1969). "Courts have countenanced the use of informers from time immemorial," usually as a matter of necessity, as the Court observed

in Hoffa v. United States, *supra* note 2, 385 U.S. at 311, 87 S.Ct. at 418, 17 L. Ed.2d 374, quoting Judge Hand's comment in United States v. Dennis, 183 F. 2d 201, 224 (2 Cir. 1950).

Clearly the instant case presents none of the characteristics of Berger v. United States, 295 U.S. 78, and see 89, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

pellant's codefendant in the form set forth in the margin, pointing to the prejudice to all defendants.[1]

This argument by the representative of the government undoubtedly prejudiced appellant. If proper of course he must stand the prejudice. If improper, reversal is required in my opinion. I think the argument was highly improper. It was a deliberate attempt to persuade the jury to accept this witness' testimony because certain notorious criminals had been brought to justice, or their criminal careers ended, through the aid of informers. These references did not have the slightest relevance to the credibility of the accomplice who testified in this case.

The court advised the jury that the argument referred to was solely to illustrate that on occasion informers came from former associates of persons charged with crime. I respectfully disagree that this was its sole purpose.[2] There was no need for the prosecutor to refer to the notorious Dillinger and other cases to furnish such an illustration, for this accomplice himself was illustrative. The main purpose was to press upon the jury extraneous instances wholly unrelated to the case on trial so as to persuade the jury to accept the credibility of this accomplice because of the service rendered the government by informers in the other instances mentioned. Moreover, the problem was not whether on occasion informers come from former associates of persons accused of crime; it was whether this accomplice, on the basis of his criminal record, should be believed. Of course the jury had a right to believe him, but not because of the Dillinger episode or the crimes described by Mr. Capote.

It seems to me the prosecutor, in his dilemma over the weakness of the testimony he was relying upon, due to the witness having a very grave criminal record, did not adhere to "the highest practical standard of fairness" the court approves, quoting from the opinion in McFarland v. United States, 80 U.S.App. D.C. 196, 197, 150 F.2d 593, 594; and *see* Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314; Cross v. United States, 122 U.S.App.D.C. 283, 353 F.2d 454.

The test of prejudice[3] has been firmly established by the Supreme Court:

But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is

---

1. [Counsel]: * * * may I respectfully move Your Honor to withdraw a juror at this stage and declare a mistrial upon the rebuttal argument of the Government, which included two references to a theory designed to inflame this jury against the defendants and did in fact prejudice this defendant.

    One was his reference to Truman Capote's book, which had no place in this trial at all, but even more important was his reference to John Dillinger and the role that Dillinger played in criminal activities and likened that role to these three defendants.

    I submit that this was highly inflammatory. It was designed to be such and did in fact prejudice these defendants.

The court: As I recall, [the prosecutor's] words, those two references had to do solely with the spectacle of one who is involved with criminals coming forward and giving state's evidence.

I will deny your motion.

2. Even were I to agree that this was its sole purpose I would still consider the references improper, and prejudicial in their effect.

3. The opinion of the court in the present case states:

    The appellant here would have us say that such references inevitably led to his being prejudiced. We are not persuaded that the incident so transcended the bounds of legitimate argument as to require reversal.

left in grave doubt, the conviction cannot stand.

Kotteakos v. United States, 328 U.S. 750, 765, 66 S.Ct. 1239, 1240, 90 L.Ed. 1557.

Dillinger's career of crime, and the crimes described in *In Cold Blood,* had "no inferable connection with the case" against this appellant. *See* Handford v. United States, 249 F.2d 295, 298–299 (5th Cir.). And I am "left in grave doubt"—Kotteakos v. United States, *supra*—that reliance by the prosecution upon those unconnected instances had no substantial influence upon the verdict. The case against appellant, depending upon a questioned identification, was close. *Compare McFarland* and *Cross,* both *supra.* Indeed, at a previous trial the jury had been unable to agree upon a conviction. The testimony of the accomplice was crucial and should not have gained credence because of the prosecution's reliance upon the Dillinger and *In Cold Blood* cases.

I respectfully dissent.