Andrew A. PRICE and Anthony N. Ferebee, Appellants,

v.

UNITED STATES, Appellee.

Nos. 84–1036, 84–1052.

District of Columbia Court of Appeals.

Argued Oct. 8, 1986.
Decided Sept. 30, 1987.

Jennifer Lyman, Public Defender Service, with whom James Klein and Christopher Stone, Public Defender Service, Washington, D.C., were on the brief, for appellant Price.

St. John Barrett, Washington, D.C., for appellant Ferebee.

Elizabeth Trosman, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Asst. U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before NEWMAN and FERREN, Associate Judges, and NEBEKER,* Associate Judge, Retired.

NEBEKER, Associate Judge, Retired:

Appellants Price and Ferebee were jointly charged with murder in the first degree while armed—deliberate and premeditated killing, D.C. Code §§ 22–2401 (1981), –3202 (1987 Supp.); murder in the first degree while armed—killing while attempting to perpetrate robbery (felony murder), id.; attempted robbery while armed, id. §§ 22–2902 (1981), –3202 (1987 Supp.) and carrying a pistol without a license, id. §§ 22–3204 (1981). After a jury trial, appellants were convicted as charged except that both were acquitted of first degree murder—deliberate and premeditated killing—while armed; instead, appellants were convicted of murder in the second degree while armed, D.C.Code §§ 22–2403 (1981), –3202 (1987 Supp.), as a lesser-included offense.

Ferebee's appeal presents the question whether he was denied a fair trial when the government, offering very favorable terms, entered into a plea arrangement with one of his accomplices in return for testimony which incriminated appellant. The other issue that Ferebee raises is whether it was plain error for the trial court not to give a jury instruction sua sponte on the credibility of an immunized witness' testimony. Co-appellant Price contends that conduct by the prosecutor during the course of the trial violated his due process rights. A second issue presented by Price is whether the trial court committed error when it failed to narrow an aiding and abetting instruction so as to exclude him from its purview. Because we find reversible error as to Price's first point, we need not and do not treat his second issue. We affirm as to Ferebee and reverse as to Price.

The government's evidence at trial established that on the evening of February 12, 1983, appellant Ferebee telephoned Michael Briscoe to solicit his help in robbing Donnell Lowery. Briscoe agreed to participate and arranged to meet Ferebee at a shopping center near the intersection of Alabama Avenue and Stanton Road, Southeast, Washington, D.C. Before meeting Ferebee, Briscoe went to appellant Price's house to enlist his help in the plan to rob Lowery. Price agreed to join in the robbery, and the two men went to the shopping center. Lowery, meanwhile, was being driven to that same location by Ferebee in the latter's automobile. Once at the shopping center, while Lowery remained in the front passenger seat, Ferebee got out of his car, approached Briscoe and Price and, while standing away from the car, he pointed out Lowery to the other two men. Price then moved over toward the car whereupon he stuck a gun through the car's open window. Lowery managed to escape by rolling up the car window, sliding across the front seat to the driver's side of the car and driving the vehicle a short distance down the street. At that point, Ferebee urged Price and Briscoe to make another attempt to "take" Lowery; however, he urged them to "take" Lowery not at the shopping center but rather in a nearby alley. Price and Briscoe made their way to the alley, and Ferebee went to his car where Lowery was waiting. Ferebee proceeded to drive his car, with Lowery as a passenger, into the alley. After Ferebee and Lowery had gotten out of the car, Price ran behind Lowery and shot him in the back from a distance of between twenty and twenty-five feet.

Immediately following the shooting, Ferebee sought refuge at a house located within a short distance of the alley where Lowery had been gunned down. While police were still at the scene of the homicide doing their investigation, Ferebee returned to the alley to retrieve his automobile which had been left in the way of other cars. He was questioned by police when he attempted to move his car, and after a

* Judge Nebeker was an Associate Judge on this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

series of inquiries the police arranged for Ferebee to be questioned further at the district police station. Ferebee first gave a spoken account of the events surrounding the shooting. Later on that same night, Ferebee voluntarily gave a written account elaborating on the details of the shooting incident, and in that version he made a number of statements which connected Briscoe and Price to the killing.

Based upon the information that Ferebee provided to police, arrest warrants were obtained for both Price and Briscoe. Before the warrant could be served on Briscoe, he surrendered to police and while in custody he gave a statement in which he described Price and Ferebee as being responsible for Lowery's killing. In this statement Briscoe exculpated himself. Briscoe was indicted on the same four charges as Price and Ferebee; however, prior to trial he entered a plea of guilty to attempted robbery, D.C.Code § 22–2902 (1981), as a lesser-included offense under the third count of the indictment. During the trial Briscoe testified as a witness for the government. Briscoe's testimony contradicted at numerous points his previous statement to police. Unlike in his first statement, at trial Briscoe admitted to involvement in the shooting.

## I

■ Ferebee contends that he was denied a fair trial. He argues that the case against him was largely dependent upon the testimony of his accomplice Briscoe and that the government knew prior to trial that Briscoe had already lied about details concerning the crime and might lie again when testifying. Thus, Ferebee asserts that the use of Briscoe's testimony, obtained as it was through a generous plea arrangement, created an unacceptable violation of due process. We can agree with

Ferebee that the testimony of Briscoe certainly solidified the circumstantial evidence connecting Ferebee to the shooting and that this testimony was a key element in his conviction. However, we disagree with him insofar as he contends the use of Briscoe's testimony caused an unfair trial.

We have previously declared that "[a] conviction may rest solely on the uncorroborated testimony of an accomplice in this jurisdiction." *Mathis v. United States*, 513 A.2d 1344, 1350 (D.C.1986) (citations omitted). Accepting this rule, we are also aware that "accomplice testimony is inherently less reliable than that of other witnesses." *United States v. Lee*, 165 U.S. App.D.C. 50, 57, 506 F.2d 111, 118 (1974), *cert. denied*, 421 U.S. 1002, 95 S.Ct. 2403, 44 L.Ed.2d 670 (1975). For this reason, it is the usual practice for the trial court to issue a cautionary instruction to the jury when such accomplice testimony has been elicited. *See* Criminal Jury Instructions for the District of Columbia, No. 2.22 (3d ed. 1978) (accomplices are competent witnesses; however, testimony should be "received with caution and scrutinized with care").[1] In the instant case, Briscoe's testimony was not uncorroborated and, in fact, it was buttressed at various points by the testimony of the other witnesses. Notwithstanding the presence of corroborating testimony, the trial court deemed it appropriate, after considerable discussion and with the approval of Ferebee's trial counsel, to deliver to the jury an amended version of Jury Instruction No. 2.22, *supra*. That instruction conveyed to the factfinder the additional caution to be exercised in evaluating Briscoe's accomplice testimony.[2] It should also be noted that this special cautionary instruction was preceded by a general instruction on credibility of witnesses.

■ Ferebee contends that the trial court committed plain error when it did not

---

1. *See also Fields v. United States*, 396 A.2d 522, 526 (D.C.1978) (it is not plain error to fail to give the accomplice instruction if there is other evidence which corroborates the accomplice testimony).

2. The trial court in its instruction declined to use the term "accomplice" and instead instructed the jury as to the caution and scrutiny to be

given the testimony of "a witness who admitted his own participation in the offenses charged against the defendants in the case." We offer no opinion as to whether this revision of Jury Instruction No. 2.22, *supra*, was merited. We do note, however, that Ferebee did not object to the instruction as given.

*sua sponte* deliver to the jury a modified version of the instruction which pertains to the testimony of an immunized witness. Criminal Jury Instructions for the District of Columbia, No. 2.225B (3d ed. 1978). Appellant argues that because of the nature of Briscoe's plea agreement his testimony was similar to that of an immunized witness; thus, a credibility instruction other than the one given was required. As we stated above, Ferebee's trial counsel agreed to the modified version of the Accomplice's Testimony Instruction, *supra,* which was delivered to the jury. Furthermore, during the course of trial, the jury was made fully aware of Briscoe's plea agreement. We reject the contention that a different credibility instruction was required under the circumstances. Thus, we hold there was no instructional error or defect which affected Ferebee's substantial rights. D.C.Code § 11–721(e) (1981).

Having established that the trial court delivered adequate credibility instructions as they pertain to Briscoe's testimony, we will now address the following due process contentions of Ferebee: the plea arrangement between the government and Briscoe was too lenient and it was accompanied by the threat of additional prosecution if Briscoe did not testify against Ferebee, and the government in using Briscoe's testimony knew he had previously lied and that he had further reason to incriminate Ferebee.

## A. The Plea Arrangement

Ferebee contends that the plea bargain arrived at between the government and Briscoe was so favorable to the latter that it was unfair to Ferebee. The argument goes as follows: The government's agreement to dismiss the charges of first degree murder (premeditated) while armed, first degree felony murder while armed, attempted robbery while armed and carrying a pistol without a license merely in exchange for Briscoe's truthful testimony at trial and a plea of guilty to attempted robbery created a plea bargain so "overwhelmingly" in Briscoe's advantage as to unfairly induce him to give incriminating

testimony against appellant. Ferebee asserts that the unfairness was exacerbated by the fact that Briscoe was aware that if he failed to testify the government could revoke the plea agreement and proceed to prosecute him on the original charges. Ferebee characterizes the government's plea bargain with Briscoe as being "coercive" because it resulted in Briscoe being unconstitutionally "coerced" into delivering testimony which incriminated Ferebee. Moreover, appellant contends, not only was the plea bargain an unfair inducement in and of itself, but the nature of the inducement serves to make the elicited testimony "inherently unreliable." Ferebee asks us to rule as a matter of law that the terms of a plea agreement may be so favorable to a criminal offender that the use of his testimony, under the agreement, to incriminate a co-defendant violates the co-defendant's due process rights.

We think appellant has misconstrued the nature of the plea bargain and the leverage exerted by the government.[3] No doubt that Briscoe had much to gain by accepting the government's offer. The prison sentences which could have been imposed for conviction of the various charges that were dismissed far exceeded the sentence which Briscoe faced for the one crime to which he pleaded guilty. Given the terms of the plea arrangement in the instant case, scrutiny of the agreement should take place while keeping in mind that the government has wide discretion in the plea bargain process. The United States Court of Appeals for the District of Columbia has said, "Where vigorous prosecution of one case threatens to undermine successful prosecution of another, it has traditionally been the prosecutor who determines which case will be pressed to conclusion, and his decision has been given great deference by the courts." *United States v. Ammidown,* 162 U.S.App.D.C. 28, 34, 497 F.2d 615, 621 (1973). The circuit court noted that there is a presumption that the United States Attorney's determination will be followed because "[h]e alone is in a position to evaluate the government's prosecution resources

3. Super.Ct.Crim.R. 11 pertains to pleas.

and the number of cases it is able to prosecute." *Id.* Along with the government having broad discretion in striking the plea bargain, the trial court retains the discretion "whether to accept or reject a guilty plea." *Hockaday v. United States,* 359 A.2d 146, 148 (D.C.1976) (citations omitted). We have defined the trial court's role in the plea bargaining process as not one of "primary responsibility, but rather [one] of guarding against abuse of prosecutorial discretion." *Hockaday, supra,* 359 A.2d at 148 (citing *United States v. Ammidown, supra,* 162 U.S.App.D.C. at 33, 497 F.2d at 621).

As indicated, appellant Ferebee's contention goes, in part, toward asserting that there has been an abuse of discretion by either the government in reaching the plea agreement or the trial court in accepting the plea. Our review of the record on appeal leads us to conclude that there has been no action by the government or the trial court about which Ferebee may complain.

Ferebee's attack on the plea agreement has another side which is that the agreement was so beneficial to Briscoe that it unfairly induced him to give testimony incriminating Ferebee. It would be impossible for this court to determine whether one plea agreement was more susceptible than another in fostering *untruthful* incriminating testimony.[4] Instead, we charge the factfinder with the task of assessing credibility. "Clearly within the province of the jury lay its assessment of the credibility of each of the witnesses as well as of the weight, if any, to be accorded to the testimony of [the accomplice]. *Turner v. United States,* 135 U.S.App.D.C. 59, 60, 416 F.2d 815, 816 (1969). During trial in the present case, not only was there testimony by Briscoe about the nature of his plea bargain with the government, he was also cross-examined concerning the contradictions between his initial statements to police and his testimony during the government's case-in-chief. We remain convinced that the factfinder must determine the credibility of witnesses and, in the process, be allowed information as to any plea agreements between those witnesses and the government.[5] The jury, not a reviewing court, is the one to decide whether a particular plea arrangement has caused a witness to give falsely incriminating testimony.

Another point made by Ferebee is that the terms of the plea agreement were so attractive to Briscoe that the agreement was "overwhelming" and thus an unfair (as against Ferebee) inducement for Briscoe to testify. Anytime the opportunity is presented to a defendant to plead guilty to a lesser charge in return for a promise to testify against his co-defendants, there is put forth an inducement for the testimony of that witness. We cannot distinguish the inducement in this case and say it is unfair simply because it differs or has terms perceived as being "more" beneficial to the defendant. As a matter of law, we conclude that the plea agreement in the instant case, as provided for by Super.Ct. Crim.R. 11, was not violative of Ferebee's due process rights.

Ferebee's final challenge to the plea agreement is that it exerted a "coercive" influence on Briscoe and forced him to give testimony which incriminated appellant. Having reviewed the transcript of the plea proceeding, we do not perceive the agreement to have been coercive. At the proceeding the information provided to Briscoe fully apprised him of the nature of his agreement with the government. The judge's colloquy with Briscoe included:

> The Court: Now Mr. Briscoe, in this matter, I understand you have entered into agreement with the government whereby the government has promised you not to

---

**4.** We emphasize untruthful because in the instant case the testimony which incriminated Ferebee only becomes a due process concern if that testimony was, in fact, untrue.

**5.** *See Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) (witness's credibility was an important issue in the case, and "evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know of it").

prosecute this matter against you if the court accepts your plea of guilty in this matter to attempted robbery and if you waive all other rights that you might have under the Constitution of the United States and voluntarily appear as a witness in this matter and testify as to the truth if you are called as a witness in this matter by the government.

As can be seen, Briscoe agreed voluntarily to appear as a witness and provide truthful testimony. Once the court accepted the plea, both the judge and the prosecutor were bound by its terms [6]—assuming that Briscoe did not breach the agreement by failing to make himself available as a prosecution witness. It was then a failure to appear which caused the government, a week after the original plea proceeding, to move to have the plea agreement vacated. The agreement remained in force, however, when Briscoe eventually agreed to testify. We do not see merit in Ferebee's contention that the plea agreement worked an unfair testimonial advantage in favor of the government and against him. The terms of the agreement did not extract incriminating testimony from Briscoe in any way that violated the due process rights of Ferebee nor was the agreement revocable by the government contingent upon the nature of Briscoe's testimony. The plea agreement did not make his testimony inherently unreliable so that the court was required to exclude it from trial.

B. Danger of False Testimony from Briscoe

Ferebee's final contention is that the government denied him a fair trial by introducing Briscoe as a witness when the government was aware that Briscoe had previously lied about the circumstances of the shooting. Moreover, Ferebee contends, because Briscoe knew that Ferebee had mentioned his name to police when giving his statement about the crime, Briscoe had cause, and the government was aware of this, to reciprocate against Ferebee by incriminating him, perhaps falsely, at trial. The government's use of Briscoe as a witness when he had a clear motive for incriminating Ferebee was, Ferebee argues, a violation of due process.

█ We conclude that the government did not disregard due process in using Briscoe as a witness in its case-in-chief. At Briscoe's plea proceeding, if not earlier, the government became aware that Briscoe had changed his version of the events surrounding the shooting. During the proceeding, Briscoe's description of the circumstances of the crime differed from the account he had originally given police, including with respect to his role in the shooting. Although the contradictions in Briscoe's statements were an indication that he had failed to tell the truth at one time or another, that is no support for the conclusion that the government fostered, encouraged or induced the giving of false testimony incriminating Ferebee. Furthermore, the fact that there seemed to be an apparent motive for Briscoe to incriminate Ferebee does not derogate from the propriety of the government using Briscoe's testimony. Again, the fact that a witness has previously changed his story or the fact that he has a motive either to testify falsely or to incriminate an accomplice is information for the jury to assimilate. Accordingly, appellant Ferebee's convictions are affirmed as against the foregoing challenges.[7]

---

**6.** *See United States v. Blackwell,* 224 U.S.App. D.C. 350, 694 F.2d 1325 (1982).

**7.** As a result of double jeopardy considerations involving three of his four convictions, appellant Ferebee contends and the government concedes that this case needs to be remanded. Ferebee's convictions include: first degree felony murder while armed, D.C. Code §§ 22–2401 (1981), –3202 (1987 Supp.); second degree murder while armed, *id.* §§ 22–2403 (1981), –3202 (1987 Supp.), as a lesser-included offense of first degree murder while armed, *id.* §§ 22–2401

(1981), –3202 (1987 Supp.) and attempted robbery while armed, *id.* §§ 22–2902 (1981), –3202 (1987 Supp.). Because second degree murder is a lesser-included offense of felony murder, one of those convictions must be vacated upon remand. *Turner v. United States,* 459 A.2d 1054, 1057 (D.C.1983), *aff'd on rehearing,* 474 A.2d 1293 (1984). Similarly, attempted armed robbery is a lesser-included offense under the broader crime of felony murder. Proof of the attempted robbery was a necessary element in the proof of the felony murder. *See Whalen v. United States,* 445 U.S. 684, 694, 100 S.Ct. 1432,

## II

Appellant Price defended against the government's case by presenting the alibi that he was home at the time the crime occurred.[8] In his testimony he indicated that his mother, sister and niece were in and around the house during the evening of February 12, 1983, and were in a position to be aware of his presence at home during the time of the shooting and immediately thereafter.[9]

At one point during the cross-examination of Price, the prosecutor sought to ask him whether his mother could testify that he had not committed the crime.[10] Counsel for Price objected to the question and a bench conference followed.[11]

In the ensuing exchange between the trial court, the prosecutor, and defense counsel, there was a discussion about the purpose of the government's question, whether the inquiry was proper or whether it violated the missing witness rule, and whether the prosecutor was going to request a missing witness instruction from the court and argue that the jury should draw an adverse inference from the fact that the alibi witnesses had not testified.

During the discussion, the prosecutor gave her reason for wanting to ask the question,[12] and she asserted that there was nothing in the decisional law that prevented the government from establishing through Price's testimony, and in front of the jury, that there were alibi witnesses available to testify. Moreover, the prosecutor indicated that she was not asking for a missing witness instruction and did not intend to argue in her closing for an adverse inference to be drawn from the fact that the alibi witnesses did not testify. Price's counsel, on the other hand, directed the court's attention to *Coombs v. United States*, 399 A.2d 1313 (D.C.1979), and argued that the government's failure to make an alibi demand, under Super.Ct.Crim.R. 12.1, prevented the prosecutor from exploring the fact that the alibi witnesses had not been called to the stand. Defense counsel asserted that the witnesses were not "peculiarly" available only to the defense and that the government, through the cross-examination of Price, was, in effect, trying to set up the same negative inference that would be suggested during a missing witness argument.

1439, 63 L.Ed.2d 715 (1980). Consequently, on remand either the conviction for attempted armed robbery or the conviction for felony murder must be vacated. If the trial court decides to vacate the underlying felony, then the felony murder conviction may stand and the second degree murder conviction must be vacated. On the other hand, if the trial court's plan is to vacate the felony murder conviction, then the other two convictions may stand. Consistent with our opinions in *Garris v. United States*, 491 A.2d 511 (D.C.1984), *cert. denied*, —— U.S. ——, 107 S.Ct. 595, 93 L.Ed.2d 595 (1986), and *Thorne v. United States*, 471 A.2d 247 (D.C. 1983), the trial court may select either alternative and then resentence on the remaining convictions so as to best "effectuate [the] original sentencing plan." *Garris*, 491 A.2d at 514.

Finally, of course, Ferebee's conviction for carrying a pistol without a license, D.C. Code § 22-3204 (1981), remains unaffected by the remand.

8. In his appeal, Price contends there were numerous instances of prosecutorial misconduct. Because we find reversible error in both a line of questions during the cross-examination and a part of the closing argument in which the government noted Price's failure to produce certain witnesses, we need not address the other

issues of prosecutorial misconduct raised by Price.

9. It should be noted that at no time did the government make a demand, as was its option under Super.Ct.Crim.R. 12.1, for notification from Price as to his intent to offer an alibi defense.

10. Although Price had earlier testified that there were at least three persons who could corroborate some or all aspects of his alibi, Price's counsel had up to this point in the trial not called any of those persons to testify. By the conclusion of the trial, neither the government nor defense counsel had called any of the three alibi witnesses.

11. The question to be asked of Price, as proffered by the prosecutor at the bench conference after defense counsel entered its objection, was as follows: "According to you, your mother would be a person to come in here and say you didn't do it?"

12. "We know they [Price's defense counsel] are not calling her [Price's mother] and he's said his mother is the only witness who can say he didn't do it, and I think the jury should know."

The trial court ruled that the prosecutor's question did not raise the same issues usually presented by a missing witness argument. Rather, the court said, the issue was whether the question was "unduly" prejudicial or unfair to the defendant. In that regard, it determined the prosecutor's inquiry was neither unduly prejudicial nor did it unfairly shift the burden of proof.[13] The court then went on to limit the permissible scope of the cross-examination.[14] When the prosecutor resumed her cross-examination of Price on the following day, the inquiry, in part, went as follows:

Q: Yesterday, Mr. Price, it was your testimony, was it not, that the one person who had the greatest opportunity to see that you were home throughout the evening, at the time in particular when this shooting took place, was your mother, isn't that right?

A: Yes.

Q: And she has been here since this trial began, hasn't she?

A: Not every day.

Q: She's here today, sir?

A: Yes, I [have] seen her today.

*    *    *    *    *    *

Q: And there's no reason that you know of, is there, that she [Price's mother] could not appear as a witness and testify that you were at home in your bedroom upstairs at the time that this shooting took place, is there? There is no reason why she couldn't testify to that?

A: No. No.

*    *    *    *    *    *

Q: You are saying your sister could say you didn't come into the house but not that you were in your bedroom, right?

A: I don't know.

*    *    *    *    *    *

Q: And your sister is here too, isn't she?

A: I ain't seen her.

Q: Your sister has been up here from West Virginia, as far as you know, since the case started, right?

A: Yes.

Q: And she's been here every day?

A: I ain't seen her. I haven't seen her every day.

Q: Some of the days?

A: No.

Q: You have never seen her any of [the] days?

A: I [have] seen her one day.

Q: There's no reason why she couldn't come in and testify, that you know of, that when she came in the house you never came in from the outside after that. There's no reason that she couldn't say that, is there?

A: No.

*    *    *    *    *    *

Q: So she [Price's niece] could testify on your behalf based on what you say she knows, right?

A: Yes.

Q: And you know that you're—you are here in trial on a first degree murder case, right?

*    *    *    *    *    *

Q: And no reason that you know of that your niece couldn't come in here and testify that you were at home at the time, is there?

*    *    *    *    *    *

Q: So as far as you know, she's [Price's niece] not here to testify on your behalf?

13. The trial court said, in part:
[We] do not have a so-called missing witness problem as I can see it. There has been no request for the court to instruct on a missing witness. And there's been no request made by either counsel to make any missing witness argument to the jury, so we just don't have a missing witness problem.

*    *    *    *    *    *

I don't see that it [the proffered question] has an unfair tendency to create undue prejudice or create the impression or give rise to an unfair inference that the defendant has a burden of proof in this case rather than the government.

14. The trial court's directions were:
[Y]ou may ask Mr. Price questions about who was there, and those factual questions that relate to their ability to have seen the matters that relate to Mr. Price's activities and whereabouts on the date in question. You may also ask those questions that relate to Mr. Price's discussions with those persons about those events at a later date.

A: She could.

Counsel for Price: Objection.

The Court: Objecton will be sustained to the question, please.

Prosecutor: Okay.

Q [by the prosecutor]: And yet, even though your mother and Sandora Bond [Price's sister] and Cynthia Wiggins [Price's niece] are the three people other than the five-year-old who could say that you were home at the time of this shooting, you took it upon yourself to ask Charles Green to be a witness for you?

With this final question, the prosecutor left the subject of absent witnesses and moved into a different area of inquiry.

At the close of evidence, the trial judge, defense counsel and the prosecutor began discussions as to the appropriate jury instructions. During the conference, counsel for Price was confronted with what he deemed was an improper attempt by the prosecutor to obtain either a missing witness instruction or permission to argue for the adverse inference. The prosecutor had requested the court give a standard missing witness instruction for Price's mother, sister and niece as set forth in Criminal Jury Instructions for the District of Columbia, No. 2.41 (3d ed. 1978). As an alternative to the instruction, the prosecutor asked to be allowed to argue before the jury that the witnesses' absence should lead to an inference that their testimony would have been adverse to Price. As a second alternative, should the first two requests be denied, the prosecutor asked to "argue the facts that have been established in the evidence of [the witnesses] not being called." See note 10, *supra.* Counsel for Price objected to the request for a missing witness instruction and to the alternative requests. As part of the objection, it was emphasized that none of the witnesses were unavailable to the government.

The trial court determined that the three witnesses at issue were equally available to both sides and thus could have been called by either Price or the government. Consequently, the court ruled that the missing witness instruction would not be given nor could the prosecutor argue for an adverse

inference to be drawn from the fact that none of the witnesses were called by Price. However, the court went on to state:

Now, beyond that, any other argument, that the evidence will reasonably support, of course, may be made by other sides without any argument being made as to what that particular witness' testimony would or would not have been had she been called. So, therefore ... the first and second prongs (see first request and first "alternative," *supra*) are denied. The third (see second "alternative," *supra*) is granted.

In light of both the trial court's ruling as to the mutual availability of the witnesses and the fact that the government had the burden of proof, counsel for Price reiterated that he believed any argument which referred to the fact that the witnesses were not called would be improper. The trial court's final ruling on the issue stated: "I see no argument [that] could be made as to what that witness' testimony would be."

During her closing argument the prosecutor's comments were, in part, as follows:

All the while [Price's] mother is in the kitchen watching TV, or she is upstairs in her room. I am on trial, [Price] is saying to you, for first degree murder. I get locked up three days after the murder. So, memories don't have to go back very far. My mother was home at the time. So, there is a live-in, human person who can come in and tell you where I was. And he didn't call her. And you have to ask yourselves why. You have to ask yourselves....

At that point, Price objected; however, the objection was overruled. The prosecutor continued with her closing and stated:

And you have to ask yourselves what does that tell you about Mr. Price's defense? It is called alibi. His defense of alibi. Is it one that you credit?

In this appeal, Price contends that the prosecutor's cross-examination and closing argument improperly brought to the jury's attention the fact that Price had not called his mother, sister or niece to testify. Although these three witnesses, according to appellant's testimony, would apparently

have been able to corroborate his alibi, Price argues that he is under no obligation to present their testimony. He claims that during cross-examination the prosecutor's questions suggested to the jury the same adverse inference that would be brought out in a missing witness argument. More pointedly, during her closing the prosecutor commented on the absence of Price's mother in a similar manner as would be done in an "incomplete" missing witness argument.[15] This, Price notes, when the trial court had already found the witnesses available to both sides.

■ The focus of our review is whether the government's cross-examination and closing argument violated the rules concerning comment on and reference to missing witnesses. The Supreme Court first articulated the missing witness rule in *Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893), when it declared that "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable." Recently in *Lawson v. United States,* 514 A.2d 787, 789 (D.C.1986), we reiterated the "requirements that must be met by a party seeking to employ a missing witness argument under the prerequisites set forth in *Graves.*" We stated:

> Before a party may argue an adverse inference as to an absent witness, counsel must seek permission from the court, and the court must determine (1) that the witness in question is peculiarly available to the party against whom the inference is sought, and (2) that the witness' testimony would have elucidated the transaction at issue.

*Id.* (citations omitted). If either one of the preconditions is missing, then counsel may

not urge the jury to draw the adverse inference. *Arnold, supra,* 511 A.2d at 415. Moreover, the two preconditions must be satisfied even before a party may make an "incomplete" or "partial" missing witness argument. *Id.* at 416.[16] In *Arnold* we described an incomplete missing witness argument as one in which "counsel merely notes the absence of a witness but refrains from asking the jury to infer that the witness' testimony would have been adverse to the other party." *Id.* at 415–16. We have concluded before and reaffirm here that a party who makes the incomplete missing witness argument is, in fact, urging the jury to infer that the absent witness would, if present, have given testimony adverse to the party who failed to call that witness. *Lawson, supra,* 514 A.2d at 790; *Arnold, supra,* 511 A.2d at 416; *Conyers v. United States,* 309 A.2d 309, 313 (D.C. 1973). *See United States v. Young,* 150 U.S. App.D.C. 98, 107 n. 16, 463 F.2d 934, 943 n. 16 (1972). By pointing out a witness' absence, counsel is plainly suggesting that if that witness were produced the resulting testimony would be adverse to the other party.

■ The prosecutor's questions here informed the jury that Price had failed to call his mother, sister and niece as alibi witnesses. The purpose of the inquiry was plainly stated during the bench conference.[17] The questions suggested that the jury draw an adverse inference from the fact that the witnesses had not testified. The resulting adverse inference may have been that the absent witnesses' testimony would have been unfavorable to Price.[18] In this way, the cross-examination of Price operated in much the same manner as an incomplete missing witness argument. We conclude that the government's inquiry should not have taken place without the

**15.** *See Arnold v. United States,* 511 A.2d 399 (D.C.1986).

**16.** Even where these two conditions are met, the trial court still must exercise discretion as to whether to instruct or permit comment on the "missing witness." *Thomas v. United States,* 447 A.2d 52, 58 (D.C.1982).

**17.** See note 12, *supra.*

**18.** As we stated in *Givens v. United States,* 385 A.2d 24, 26 (D.C.1978), "[w]hen a party who would naturally be expected to call a witness fails to do so, an inference may arise that the witness was not called because his testimony would have been unfavorable to that party."

trial court first determining that the same preconditions necessary for an incomplete missing witness argument were also present here. Thus, under the circumstances, we hold that it was error to suggest to the jury through cross-examination that the missing witnesses would have provided unfavorable testimony against Price.[19] We also perceive another potential danger in the government's cross-examination. The line of questioning could have suggested that Price had failed to meet a burden to produce witnesses in his defense. We counsel against a practice in which cross-examination might improperly imply that the burden of proof has shifted or that a defendant has been saddled with the responsibility to produce witnesses.

Following up on the testimony elicited during cross-examination, the government requested both a missing witness instruction and permission to argue the adverse inference. The prosecutor's request clearly contradicted an earlier statement that the government had no intention to seek an instruction or to argue the adverse inference. Later in the proceeding, finding that the witnesses were not peculiarly available to Price, the court denied both parts of the request. However, the denial was qualified in that the court stated the government could argue the evidence. We draw no conclusion about the correctness of the court's statement as it applied to the missing witness testimony elicited from Price. We do conclude, however, that the prosecutor went beyond the permissible scope of argument that the trial court said it would allow. We hold the prosecutor's closing reference to Price's mother and the fact that she was a "live-in, human person who [could] come in and tell [the jury] where [Price] was" to be erroneous in light of the trial court's earlier ruling which denied the request to make a missing witness argument. Consequently, the trial court erred in overruling Price's objection to the prosecutor's argument. We deem the error to

warrant reversal as Price's alibi defense was a critical aspect of the case.

Accordingly, the judgment of convictions with respect to appellant Price is reversed and the case remanded for a new trial. The judgment of convictions of appellant Ferebee is affirmed and the case remanded for further proceedings consistent with this opinion.

---

19. Once it is established that the missing witness questions should not have been asked without the two preconditions first being satisfied, the error in this case becomes manifest. This is so

because the trial court, in denying the request for a missing witness instruction, determined that the witnesses were not peculiarly available to Price.