**Thomas E. HARRIS, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 87–155.

District of Columbia Court of Appeals.

Argued en banc Nov. 8, 1990.
Decided Jan. 15, 1992.

Paul H. Zukerberg, Washington, D.C., appointed by the court, for appellant.

Elizabeth Trosman, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., Michael W. Farrell and Mary Ellen Abrecht, Asst. U.S. Attys. at the time the brief was filed, and John R. Fisher, David Schertler and Gregory E. Jackson, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before ROGERS, Chief Judge, FERREN, TERRY, STEADMAN, SCHWELB, and WAGNER, Associate Judges, and NEWMAN,[*] MACK, and BELSON,[**] Senior Judges.

## ON REHEARING EN BANC

BELSON, Senior Judge:

A jury convicted appellant Thomas E. Harris of distribution of phencyclidine (PCP) and marijuana and of possession with intent to distribute PCP and marijuana in violation of D.C.Code § 33–541(a)(1) (1988). On appeal Harris contends that prosecutorial "misconduct," primarily in questioning Harris and arguing to the jury regarding "missing witnesses" without first seeking the permission of the trial court, denied Harris a fair trial and substantially prejudiced the jury. At trial Harris did not object to the prosecutor's conduct. We hold that Harris has failed to demonstrate plain error, and therefore affirm.

## I.

Our application of the plain error rule will require an evaluation of the strength of the government's case. Therefore, we recite the salient facts in some detail. The government's evidence showed that on August 21, 1984, Officer Byron Wallace, working in plain clothes, was assigned to attempt to purchase illegal drugs. At approximately 1:30 p.m., Wallace drove down the 1800 block of 6th Street, N.W., Washington, D.C., in his personal vehicle. He saw Harris standing on the east side of the street. At that time, Harris was the only person visible in that particular block of 6th Street. Wallace asked him if he had any "loveboat," a street term for PCP. Harris indicated that he did and told Wallace that it would cost $15.00. After Wallace agreed to the purchase price, Harris removed a tin foil packet from a brown paper bag and gave the packet to Wallace. Wallace checked the contents of the packet and discovered that it contained a brownish weed with a strong chemical odor of PCP. Wallace gave Harris a twenty dollar bill drawn from Metropolitan Police Department funds that had been prerecorded by Officer Dwight Mitchell, Wallace's partner.[1] Harris then handed Wallace five dollars in change. Wallace drove away from

---

[*] Judge Newman was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on March 11, 1991.

[**] Judge Belson was an Associate Judge of the court at the time of argument. His status changed to Senior Judge on July 24, 1991.

1. Officer Mitchell recorded the serial number from the twenty dollar bill in a notebook and gave it to Wallace to be included in the case file. During another undercover operation unrelated to the instant one, Wallace's briefcase containing this file was stolen from his vehicle.

the area and met Officer Mitchell in the 600 block of O Street, N.W. Wallace described Harris to Officer Mitchell as 5′9″ to 5′10″ tall, approximately 160–170 pounds, wearing green pants, a white pinstriped shirt, and a golf hat.

Officer Mitchell then called for assistance. In addition to Officers Washington and Davis in a uniformed patrol unit, Officer Sovonick and Sergeant Marshall from the vice unit assisted Officer Mitchell. The officers saw Harris in the 1800 block of 6th Street, N.W., and detained him because he matched the lookout description. Officer Mitchell searched where Harris had been standing, "an elevated area higher than the sidewalk," and found a brown paper bag containing three tinfoil packets of PCP.

Officer Washington placed Harris in the prisoner transport cruiser and drove him to 6th and O Streets, N.W., where Wallace positively identified him as the person who had sold him the PCP. Two officers then transported Harris to the First District. After Harris got out of the car, Officer Washington searched it and found a folded twenty dollar bill in the back of the transport cruiser where Harris had been seated. Officer Washington testified that according to police department procedures, the transport vehicle must be searched at the beginning of each tour and immediately after a prisoner has been transported to a station. According to Officer Washington, Harris was the only person who had been transported in that vehicle that day. Officer Mitchell compared serial numbers of the twenty dollar bill he had given Wallace to purchase drugs and the twenty dollar bill found in the transport cruiser. The serial numbers matched. The government adduced evidence that the substance recovered included usable amounts of marijuana and PCP.

Harris presented the defense of mistaken identity. Harris denied that he had lived at the address written on the arrest report

and that he had given the false name, James Harris, to Wallace.[2] Harris further testified that on August 21, 1984, between noon and 12:30 p.m., he was in the 1800 block of 6th Street, N.W., playing dice for money with other men in an alley and heard two persons on the street selling drugs. After losing forty-five of the fifty-one dollars he had, he went to a nearby store to get something to drink or change for the telephone. Upon returning from the store, Harris stated, he noticed that everyone who previously had been on the block was gone, except for one person, and that an officer then approached and arrested him. Harris asserted that the officer then searched him, took six dollars from him, and placed him in the back of a police cruiser. He was driven to M Street, taken out of and placed back in the vehicle, and then driven to 13th and H Streets where a white male was also placed in the back seat of the vehicle. Harris stated that next he and the other man were driven to the First District, handcuffed at all times.

During cross-examination, Harris denied selling drugs to Wallace.[3] He stated that he arrived at the scene of his later arrest around 12 noon or 12:30. When asked how he had gotten there, he responded that he had walked from 11th & Florida Avenue, volunteering that he had been at the Florida Avenue Grill visiting a friend. He also answered that he had left that place around 11:30 or 11:45. After Harris stated that he still knew that the friend in question, the prosecutor asked Harris, "Did you try to see if you could get that friend to come in here and testify?" Harris answered:

> Yes, I did but they don't want to be— like, okay, I even seen one of the guys that I was gambling with but they don't want to get caught up in no cases whereas they might can get another charge for testifying or they don't want to be able to like—like no police to see them where

**2.** Wallace testified that at the time of the arrest appellant represented himself as James Harris, the name that appeared on the arrest report. Appellant's true identity was determined from his fingerprints.

**3.** The government impeached appellant with the following prior convictions: carrying a dangerous weapon (gun) (1980); petit larceny (1979); attempted robbery (1980); and assault with a deadly weapon (gun) (1980).

they could can have to be like harassing them. Because the police harass people.

\* \* \* \* \* \*

They wouldn't testify. I'm saying I just got caught up in something, you know, and I got to deal with it. They won't testify for me.

The prosecutor then asked Harris to name the persons with whom he had been playing dice. In the ensuing colloquy, Harris acknowledged knowing one of those playing dice as Raymond Jones and stated that he had asked him to testify at trial but that the witness said he would not come.[4] Defense counsel did not object to this line of questioning.

Wallace testified on rebuttal stating that at the time he purchased drugs from Harris no one else was in the area selling drugs and he did not see anyone playing dice. Officer Mitchell corroborated Wallace's testimony by stating that no one else was in the area. Officer Mitchell further stated that he did not remember removing any money from Harris' possession at the

time he was arrested. Similarly, Officer Washington testified that although Harris was frisked for weapons before he was placed in the transport cruiser, no money was taken from him. He also demonstrated how Harris, with his hands cuffed behind his back, could have placed his hands in his pockets. In surrebuttal testimony, Harris demonstrated how the use of his left hand had been limited by a gunshot wound.

## II.

Harris contends that the prosecutor committed "misconduct" by failing to secure permission from the trial court before making what amounted to a missing witness argument by his cross-examination of Harris.[5] In this way, Harris contends, the prosecutor jeopardized the fairness and integrity of the trial and substantially prejudiced the jury, requiring reversal.

 We will identify first the standard by which we will measure any such impro-

---

4. The following colloquy took place:

Q Well, you said you knew some of them, what were their names?
A One was named Raymond Jones.
Q And where does Raymond Jones live?
A I do not know his address.
Q You don't know his address?
A No.
Q What—how did—how do you know him?
A How do I know him. I see him around, like in the evening time after work you might see him at the like dance or something like that. I know a whole lot of people like not as far as like personally, personally but I mean just as far as like street personally like that.
Q Who else did you know in the dice game?
A I didn't know the other guys, I just knew Raymond Jones.
Q How many people were playing in the dice game?
A It was three.
Q How many people were selling drugs on the street?
A Was two.
Q Just two?
A Okay, look, one was playing crap, one was selling.
Q One was playing craps and one was selling?
A Yeah.
Q I thought you said there were only three people playing craps?

A That's all there was was three. Okay, it was me, two guys playing crap, and one person was selling.
Q And you—you only knew one person?
A I only knew one person.
Q And you tried to get him come down here and testify?
A Uh-uh, I just seen him. I talked to him when I was out the last time on the street.
Q When was that?
A Back in May.
Q And what did he say?
A He said he couldn't come for me.
Q Why is that?
A Because they just won't come to court, man. I don't know why, they just—I mean, you know, if you get caught up, you just gotta deal with it the best way it is, the best way you can. That's the way it is.

5. The term "misconduct" has frequently been used to describe mistakes made by counsel in the heat of trial. As the term suggests unethical behavior, it is an unduly harsh description for many of the unintentional or relatively minor lapses of counsel during trial. *See McGrier v. United States,* 597 A.2d 36, 40–41 (D.C.1991). In this opinion, we use instead the terms "impropriety" and "improper." As we use them, the terms "impropriety" and "improper" convey the notion that the prosecutor's question or comment was not legally permissible. They do not convey the notation that the prosecutor's behavior was unethical or immoral.

priety by the prosecutor in this case, next evaluate the claim that the prosecutor actually committed any impropriety in his cross-examination of Harris, and finally measure any demonstrated impropriety against that standard. When reviewing allegations that a prosecutor conducted an examination or argument improperly, we determine first whether the prosecutor's statements or actions actually were improper. *Gray v. United States,* 589 A.2d 912, 916 (D.C. 1991); *Hammill v. United States,* 498 A.2d 551, 554 (D.C.1985). Normally, where we find that an impropriety has occurred and that the defendant has made appropriate objection, we then determine whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." *(Phillip) Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980) (quoting *Gaither v. United States,* 134 U.S.App. D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (footnote omitted) (quoting in turn *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946))). This is done based on "the gravity of the misconduct, its relationship to the issue of guilt, the effect of any corrective action by the trial judge, and the strength of the government's case." *Gray, supra,* 589 A.2d at 916 (quoting *Dixon v. United States,* 565 A.2d 72, 75 (D.C.1989)); *accord, Mitchell v. United States,* 569 A.2d 177, 183 n. 5 (D.C.), *cert. denied,* — U.S. —, 111 S.Ct. 521, 112 L.Ed.2d 532 (1990);

*Sherrod v. United States,* 478 A.2d 644, 655 (D.C.1984).

The government contends here, however, and we agree, that because Harris made no objection at trial concerning the errors he asserts on appeal, the appropriate standard to apply here is the more demanding plain error doctrine. *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc); *accord, Jones v. United States,* 512 A.2d 253, 258 (D.C.1986); *Mitchell, supra,* 569 A.2d at 183 n. 5; *see also* Super.Ct.Crim.R. 52(b).

It is well settled that reversal under the plain error doctrine is justified only in exceptional circumstances where "a miscarriage of justice would otherwise result." *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982). Stated otherwise, "error[s] complained of must be so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts, supra,* 362 A.2d at 709; *accord, Allen v. United States,* 495 A.2d 1145, 1152 (D.C.1985) (en banc); *(Frank) Arnold v. United States,* 467 A.2d 136, 137–38 (D.C.1983). "An error, of course, must be more than obvious or readily apparent in order to trigger appellate review" under the plain error standard. *United States v. (Billy) Young,* 470 U.S. 1, 17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985).[6] As we recently stated, "[t]he Supreme Court has cautioned that reversal for plain error in cases of alleged prosecutorial misconduct should be confined to 'particularly

---

**6.** The context in which the Supreme Court used the language quoted from *Young* is instructive. The prosecutor there had brought about error by responding to defense counsel's improper closing argument by stating the prosecutor's own "personal impressions" that the defendant had committed fraud and that the jurors would not be "doing [their] job as jurors" if they acquitted defendant. In that situation, the Supreme Court said:

> The Court of Appeals held that the prosecutor's improper remarks constituted "plain error" solely because the prosecutor ignored that court's rule prohibiting such responses. A *per se* approach to plain-error review is flawed. An error, of course, must be more than obvious or readily apparent in order to

trigger appellate review under Federal Rule of Criminal Procedure 52(b). Following decisions such as *United States v. Frady,* United States v. Socony–Vacuum Oil Co., supra,* [310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)], and *United States v. Atkinson,* [297 U.S. 157, 56 S.Ct. 391, 80 L.Ed. 555 (1936)], federal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error not only seriously affected "substantial rights," but that it had an unfair prejudicial impact on the jury's deliberations. Only then would the court be able to conclude that the error undermined the fairness of the trial and contributed to a miscarriage of justice.

*(Billy) Young, supra,* 470 U.S. at 16 n. 14, 105 S.Ct. at 1047 n. 14.

egregious' situations." *Doe v. United States*, 583 A.2d 670, 676 (D.C.1990) (citations omitted).

■ This court, when addressing allegations of plain error, must review the entire record because "[i]t is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means." *(Billy) Young, supra,* 470 U.S. at 16, 105 S.Ct. at 1047.

> In reviewing criminal cases, it is particularly important for appellate courts to relive the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure. To turn a criminal trial into a quest for error no more promotes the ends of justice than to acquiesce in low standards of criminal prosecution.

*Id.* (quoting *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 555, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring)).

Relaxation of the "exacting definition of plain error," *(Billy) Young, supra,* 470 U.S. at 15, 105 S.Ct. at 1046, should be avoided; to do otherwise "would skew the ... 'careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.' " *Id.* (quoting *Frady, supra,* 456 U.S. at 163, 102 S.Ct. at 1592 (footnote omitted)).

Our ultimate focus in this case, therefore, is on whether the asserted errors jeopardized the very fairness and integrity of the trial and contributed to a miscarriage of justice rather than simply on the propriety of the prosecutor's actions. *See Black v. United States*, 506 A.2d 1130, 1131 (D.C.1986).

### III.

We turn to a discussion of the missing witness rule. It has been recognized for almost a century that "if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not do it creates the presumption that the testimony, if produced, would be unfavorable."

*Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). This court has clarified the circumstances in which the missing witness argument may be permitted and has established the procedure to be followed by counsel who wish to make the argument. We have emphasized that the trial court must first determine both "that the witness in question is peculiarly available to the party against whom the inference is sought, and ... that the witness' testimony would have elucidated the transaction at issue." *Lemon v. United States*, 564 A.2d 1368, 1375 (D.C.1989) (quoting *Lawson v. United States*, 514 A.2d 787, 789 (D.C.1986)); *see also German v. United States*, 525 A.2d 596, 611 (D.C.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987); *Thomas v. United States*, 447 A.2d 52, 57 (D.C.1982); *Conyers v. United States*, 309 A.2d 309, 312–13 (D.C.1973); *United States v. (James) Young*, 150 U.S.App.D.C. 98, 103–05, 463 F.2d 934, 939–41 (1972).

■ The first requirement, peculiar availability, is satisfied if "the party had the physical ability to locate and produce the witness and there was such a relationship, in legal status or on the facts as claimed by the party as to make it natural to expect the party to have called the witness." *Thomas, supra,* 447 A.2d at 57 (quoting *(James) Young, supra,* 150 U.S.App.D.C. at 107, 463 F.2d at 943); *accord Lawson, supra,* 514 A.2d at 791. Two aspects of peculiar availability must be met. First, a witness must be physically available, *i.e.*, capable of being brought to court. If not, "no factual conclusion can be drawn from the failure to produce him. In general, a witness is not physically available unless he can be located ... and is within the subpoena power of the court." *Thomas, supra,* 447 A.2d at 57 (citations omitted). Second, practical availability is required. The party's ability or reasons for producing the witness "must be stronger than those of the party seeking an inference in his favor." *Id.* at 58.

■ To meet the second requirement, it must be demonstrated that the absent witness' testimony would elucidate the trans-

action. This is determined by inquiring whether the testimony is "relevant and material to a disputed issue in the case[,] ... noncumulative, and an 'important part' of the case of the party against whom the inference is drawn." *Id.* at 57 (citations omitted).

 Both requirements must be met before counsel may be permitted to make even a partial or incomplete missing witness argument. *Lemon, supra,* 564 A.2d at 1375. Counsel makes a partial or incomplete missing witness argument when counsel notes the absence of a witness but fails to take the additional step of asking the jury to infer that the witness' testimony would have been adverse to the other party. If counsel takes that step, the argument becomes a complete missing witness argument. *Id.; Lawson, supra,* 514 A.2d at 789–90; *(James) Arnold v. United States,* 511 A.2d 399, 415–16 (D.C.1986). Unless the party seeking to use a missing witness argument can meet both requirements, the trial court must preclude counsel from making either type of missing witness argument, and the trial court itself must not give a missing witness instruction. *See Dent v. United States,* 404 A.2d 165, 169–70 (D.C.1979).

 It has long been clear in this jurisdiction that before making a missing witness argument, counsel must obtain advance consent from the trial court. *See Chappell v. United States,* 519 A.2d 1257, 1259 (D.C.1987); *accord (James) Arnold, supra,* 511 A.2d at 415; *Parks v. United States,* 451 A.2d 591, 614 (D.C.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983). "When counsel, either for the prosecution or the defense, intends to argue to the jury for an inference to be derived from the absence of a witness, an advance ruling from the trial court should be sought and obtained." *Gass v. United States,* 135 U.S.App.D.C. 11, 19, 416 F.2d 767, 775 (1969) (footnote omitted). "[T]o avoid injecting prejudicial error into the trial," advance permission

from the trial court is needed even before counsel makes an incomplete missing witness argument. *(James) Arnold, supra,* 511 A.2d at 416. By so doing, the trial court can "ensure that the foundational issues are addressed *before* possibly improper inferences are suggested to the jury." *Id.* (emphasis in original) (quoting *Thomas, supra,* 447 A.2d at 58).

We note that in closing argument the prosecutor made no mention of any of the potential defense witnesses discussed here, *i.e.,* the persons Harris said were playing dice with him before his arrest or the friend Harris had seen at the Florida Avenue Grill. This court has recognized, however, that the impact of some techniques of cross-examination can be substantially the same as an incomplete missing witness argument. *See Chappell v. United States,* 519 A.2d 1257, 1259 (D.C.1987); *Sherrod v. United States,* 478 A.2d 644, 654 (D.C. 1984). Thus, Judge Nebeker wrote for the court in *Price v. United States:*

> The [prosecutor's] questions suggested that the jury draw an adverse inference from the fact that the witnesses had not testified. The resulting adverse inference may have been that the absent witnesses' testimony would have been unfavorable to Price. In this way, the cross-examination of Price operated in much the same manner as an incomplete missing witness argument. We conclude that the government's inquiry should not have taken place without the trial court first determining that the same preconditions necessary for an incomplete missing witness argument were also present here.

531 A.2d 984, 993–94 (D.C.1987); *accord, Lemon, supra,* 564 A.2d at 1375.[7]

 We have recognized that it is permissible for counsel to cross-examine with a view toward establishing that a purported witness does not exist and that this is different from a missing witness implication. *See generally Alston v. United States,* 552 A.2d 526, 528 (D.C.1989). Be-

---

7. We recognize that the case before us was tried before we clarified in *Price* and *Lemon* that the principles applicable to missing witness argument apply also to cross-examination that may operate in much the same manner.

cause, however, counsel may explore whether, in fact, a witness actually exists in such a fashion as to suggest a missing witness inference, advance permission from the trial court should be sought. The trial court, when exercising its discretion whether to permit such questioning, should give consideration to our holdings that it is permissible for counsel to attempt to establish by cross-examination the non-existence of a purported witness.

Finally, we reiterate that the trial court has the discretion, even if the requirements of both peculiar availability and elucidation are met, to deny a request for a missing witness argument and instruction. As we stated in *Thomas, supra:*

> This discretionary decision should be guided by reference to the underlying rationale for the doctrine, by considering "whether from all circumstances an inference of unfavorable testimony from an absent witness is a natural and reasonable one."

*Thomas, supra,* 447 A.2d at 58 (quoting *Dent v. United States,* 404 A.2d at 165, 171 (D.C.1979)); *see also German, supra,* 525 A.2d at 611; *Lawson, supra,* 514 A.2d at 791; *Miles v. United States,* 483 A.2d 649, 658 (D.C.1984).

In the instant case, the government violated the *Gass* rule, as it appropriately concedes,[8] when the prosecutor cross-examined Harris concerning his failure to call witnesses who supposedly could have given testimony favorable to Harris, without first obtaining the permission of the trial court. *See Arnold, supra,* 511 A.2d at 416. The government argues, however, that the prosecutor did not engage in a complete missing witness argument or equivalent interrogation and that the prosecutor's failure to obtain the trial court's consent before questioning appellant regarding the absence of Raymond Jones and other witnesses amounted to a "mere procedural error."

We agree with the government that the prosecutor's questions did not amount to a complete missing witness argument. This is so because the prosecutor did not directly urge the jury to infer from the fact that Harris did not call Raymond Jones as a witness that, if called, Jones would have testified adversely to Harris. *See Black, supra,* 506 A.2d at 1132.[9]

We are also satisfied, for the reasons we explain below, that had the prosecutor sought the trial court's permission to question Harris about the persons he said he was playing dice with, it would have been within the trial court's "considerable discretion" to allow cross-examination on this matter. *See Garris v. United States,* 465 A.2d 817, 822 (D.C.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1013, 79 L.Ed.2d 243 (1984). We reach a contrary conclusion about the prosecutor's brief questioning concerning the friend Harris had visited at the Florida Avenue Grill, but find that lapse of little consequence, as we will also explain.

With respect to whether the dice game witnesses were peculiarly available to Harris, he answered on cross-examination at trial that he had asked Raymond Jones and his friends, who were allegedly playing dice with Harris just before he was arrested, to come to court to testify and that they refused. This response, however, did not automatically foreclose the inquiry of whether Raymond Jones was peculiarly available as a witness for Harris. It is true, of course, that if a witness such as Jones cannot be located or is not within the subpoena power of the court, he is not physically available. But Harris never testified that Raymond Jones could not be located; to the contrary, Harris merely stated that he did not know where Raymond Jones lived.[10] That fact, standing

---

8. Associate Judges Steadman and Schwelb express no opinion as to whether the government's concession was appropriate.

9. The prosecutor's cross-examination of Harris concerning the alleged missing witnesses could have served the purpose of determining whether, in fact, the witnesses actually existed. *See Alston, supra,* 552 A.2d at 528.

10. Our dissenting colleagues engage in conjecture in suggesting that Harris "had asked his attorney to subpoena the missing witnesses, but that his attorney could not locate them. (Dissent at 171) (footnote omitted). The record

alone, is insufficient to counter the government's argument that Raymond Jones was peculiarly available to Harris. Reasonably diligent efforts to produce Raymond Jones would have included investigation and the use of compulsory process provided by the court, means apparently not employed by Harris.

It would distort the missing witness doctrine if a court were to find that a witness is not peculiarly available to a party based merely upon that party's testimony that an absent witness preferred not to come to court to testify or that the party did not know the witness' address. Under the circumstances, we cannot say that Harris made a "bona fide reasonable effort[ ] to produce the witness without success." *See Thomas, supra,* 447 A.2d at 57.

We turn now to the second requirement, that the witness' testimony would elucidate the transaction. With respect to Raymond Jones, for example, the court would have to be satisfied that his testimony would be "relevant and material to a disputed issue in the case." *Id.* Harris testified that just prior to being arrested he played dice in the alley with some men and that he saw two men on the street selling drugs. Because Harris stated that Raymond Jones was one of the men with whom Harris was playing dice, Raymond Jones could have corroborated Harris' testimony, bolstered his credibility, and supported his defense theory of mistaken identity. If Raymond Jones had been called as a witness for the defense, his testimony would have been relevant and material to Harris' case. *See generally (John) Harris v. United States,* 430 A.2d 536, 543 (D.C.1981) (missing witness' testimony would have been material to explain defendant's presence in the vicinity of the crime, and it is not important that witness be eyewitness to the event at issue). The sum of this discussion is that

under the circumstances of this case it would have been within the trial court's broad discretion to permit the prosecutor to engage in the missing witness interrogation that he conducted concerning the persons Harris said were engaged in the dice game with him.

The same, however, cannot be said of the prosecutor's questions concerning the friend who was with Harris at the Florida Avenue Grill fifteen minutes or more before Harris arrived at the location where he was arrested about an hour and half later. Given the circumstances, it is doubtful that that friend could have shed light upon the transactions or occurrences that led to Harris' arrest. There is nothing in the record to suggest that the friend Harris met at the Grill was anywhere in the vicinity of the scene of the Harris' arrest at any point between their encounter at the restaurant and Harris' arrest some one and a half hours later. Given this degree of remoteness, the trial court would not have acted within its discretion in permitting a missing witness argument, or interrogation to the same effect, concerning this witness. But because it was obviously unlikely that this friend could shed any light on the circumstances surrounding Harris' arrest, it is also highly unlikely that the jury attached much significance to the absence from trial of the friend who had seen Harris at a distant restaurant well before the time of the arrest.

To proceed with our assessment of Harris' claim of plain error, we must also evaluate the strength of the government's case. *Jones v. United States,* 512 A.2d 253, 258 (D.C.1986). We find it a reasonably strong case, even though we recognize that there were questions of credibility that the jury had to resolve. Wallace, an experienced police officer, made an undercover

---

reflects in this connection that on redirect examination, Harris answered in the affirmative when asked "were you ever asked by your attorney whether you had witnesses to be subpoenaed here to—for trial?" He went on to answer that he had given his counsel the street names of the witnesses, but stated that he could not give their addresses. He was never asked whether he had given his attorney the actual

names of the witnesses. He stated that the reason he couldn't give the witness' addresses was "because I didn't know the addresses and they won't give 'em to me." Defense counsel, who had recalled Harris to the stand for redirect solely to deal with this matter, adduced no other testimony and made no proffer concerning efforts to locate and subpoena the witnesses.

buy of marijuana laced with PCP from Harris and then gave Officer Mitchell a description of Harris. Several other officers soon located and detained Harris who matched the description. An officer searched the area where Harris had been standing and found a brown paper bag containing three additional packets of marijuana treated with PCP. Wallace positively identified Harris at another location as the individual who sold Wallace the illegal drugs. Wallace had paid for the drugs with a twenty dollar bill pre-recorded by his partner. The serial number of the twenty dollar bill found by Officer Washington in the back seat of the police cruiser which transported Harris matched the serial number of the money used in the undercover buy.

These facts make the government's case reasonably strong. The defense theory that all the officers involved agreed, for some reason, to conspire to fabricate from whole cloth a case against Harris, while not impossible, finds virtually no support in the record other than Harris' own testimony. The defense suggested no reason why the police would wish to fabricate a case against him. The defense did raise questions about the loss of the record of the serial number of the twenty dollar bill used for the buy and about the transport log that referred to a second back seat passenger. But government witnesses gave explanations for those matters and, more significantly, other circumstances lent plausibility to the government's case. Harris was the only individual in the vicinity of the place of his arrest who matched the description given the officer who made the buy. Indeed, he was the only person visible in the block at that time. Additionally, it is unlikely that another drug dealer had just happened to abandon his valuable stash near where appellant happened to be standing. In sum, having assessed the strength of the government's case as a part of our plain error analysis, we deem it, as we have said, a reasonably strong case.

We also observe that the questioning at issue most likely did not create an "unfair prejudicial impact on the jury's deliberations," *Young, supra,* 470 U.S. at 17 n. 14, 105 S.Ct. at 1047 n. 14, because, even if the prosecutor did not raise this matter, the jury would have been aware from Harris' testimony that the men playing dice with Harris just prior to his arrest had not come to testify in court. It would have been apparent to the jury that Harris had been the only person who testified that he had been engaged in this relatively innocuous activity shortly before his arrest while another person was hawking drugs nearby.

It is also significant that, when Harris answered the prosecutor's questions, he used the opportunity to give his explanation for the absence of the men, *viz.,* they did not want to come to court to testify and place themselves in a position where the police might harass them or bring charges against them. The jury might well have found this explanation plausible.[11]

Thus, while we find that the prosecutor injected at least some error into this case by failing to obtain the advance permission of the trial court before questioning appellant about persons who did not appear at trial, we cannot find that the error was of a serious nature. It is clear that the missing witness questioning here did not of itself bring about a miscarriage of justice.

## IV.

■ Harris also argues that during rebuttal closing argument the prosecutor impermissibly argued that the testimony of the police officers should be believed over the testimony of Harris because police officers had too much at stake to risk committing perjury. This conduct, Harris argues, was an improper declaration about credibility and occasioned cumulative prejudice which, coupled with the missing witness questioning, jeopardized the fairness and integrity of his trial. We disagree.

In disagreeing, we do not overlook the fact that the issue of credibility was important. Defense counsel stated in closing

---

**11.** With respect to the typical jury's ability to sort out such matters, *see United States v. Cotter,* 60 F.2d 689, 699 (2d Cir.1932); E. CLEARY, McCOR-MICK ON EVIDENCE § 272, at 807–08 (3d ed. 1984).

argument that the government had introduced Harris' prior convictions to demonstrate that Harris was not a credible person, and pointed out that at the same time the police officers' in-court testimony and certain documentary evidence were in conflict. The prosecutor, in rebuttal closing argument, stated that in order to find Harris not guilty the jury would have to believe that the police officers perjured themselves, risking their careers, their futures, and their retirements. The prosecutor further observed that if the officers had decided to fabricate their testimony, they could easily have made up an air-tight case against Harris.

The prosecutor's rebuttal argument was at least arguably a fair response to defense counsel's closing. But even if we assume that the prosecutor should have refrained from making these statements because they were not based on record evidence, the resulting prejudice, if any, was slight. It would be reasonable for jurors to think that the consequences facing an officer who is caught giving perjured testimony are severe enough to deter such conduct. Finally, the trial court instructed the jury that the arguments of counsel could not be considered as evidence and that in a criminal case the burden of proof never shifts to the defendant. The jury is presumed to have followed these instructions, *Clark v. United States*, 593 A.2d 186, 193 (D.C. 1991), and this court will not "upset the verdict by assuming the jury declined to do so." *Gray, supra*, 589 A.2d at 918.

Considering both Harris' argument concerning the police officers' motivation for avoiding perjury and the arguments Harris makes on the missing witness issue, it is clear to us that Harris has not even approached a showing of the prejudice that would be required to undermine its essential fairness of the trial and to constitute a miscarriage of justice. Although the prosecutor injected error into the proceedings to the limited extent we have discussed in the missing witness area, and assuming that the argument about the police officers' careers was objectionable, the error did not reach the level of plain error.

## V.

■ We also reject Harris' contention that the prosecutor's comments during rebuttal closing argument completed the missing witness argument and shifted the burden of proof. The prosecutor stated:

Furthermore, each police officer as they testified, each officer's testimony corroborated different parts of another officer's testimony, where they met, how they met, what they decided to do, what happened to Mr. Harris when they arrested him. Was there any kind of corroboration for Mr. Harris's testimony. Is there anything to corroborate or support what he told you. There's not.

Such argument, we hold, was permissible because it merely conveyed to the jury that when evaluating the credibility of a witness, corroboration or a lack thereof of the testimony should be considered. The government, by its missing witness interrogation of Harris and subsequent argument, did not shift the burden of proof. The government had the right to argue the strength of its case and contrast it with the weakness of Harris' defense. That mode of argument did not, of itself, shift the burden of proof to Harris. Moreover, the trial court properly instructed the jurors that they could "consider whether the witness has been contradicted or corroborated by other credible evidence in the case." *See* Criminal Jury Instructions for the District of Columbia, No. 2.11 (3d ed. 1978); *see also United States v. Sensi*, 279 U.S.App.D.C. 42, 53–54, 879 F.2d 888, 899–900 (1989); *United States v. Glantz*, 810 F.2d 316, 321 (1st Cir.), *cert. denied*, 482 U.S. 929, 107 S.Ct. 3214, 96 L.Ed.2d 701 (1987); *United States v. Gotchis*, 803 F.2d 74, 79–81 (2d Cir.1986).

Based on the foregoing, Harris' conviction is

*Affirmed.*

WAGNER, Associate Judge, concurring in part and dissenting in part:

I concur in the result reached by the court, and I agree with much of its reasoning. My disagreement goes only to the

court's determination that error occurred when the prosecutor failed to obtain an advance ruling from the trial court before cross-examining appellant about the existence and availability of claimed witnesses. In my opinion, neither the missing witness rule nor reasons of fairness requires a preview and prior ruling on proper foundational questions propounded to support a missing witness argument or instruction.

The *Gass* rule, which forms the underpinnings of the court's finding of error, established that advance permission must be obtained from the court before counsel for either side argues to the jury that an adverse inference may be drawn from the witness' absence. *Gass v. United States,* 135 U.S.App.D.C. 11, 19, 416 F.2d 767, 775 (1969). In *Gass,* the prosecutor argued the adverse inference from the failure of Gass to call eight witnesses who allegedly had information crucial to his defense. *Id.* However, the availability of the witnesses had not been explored during testimony. *Id.* Therefore, one of the two essential requirements for making the missing witness argument or obtaining the missing witness instruction (*i.e.,* peculiar availability to the party against whom made) had not been established. *See Graves v. United States,* 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893); *Lemon v. United States,* 564 A.2d 1368, 1375 (D.C.1989). The rationale for a preliminary ruling before argument is to guard against the improper use of an adverse inference where the evidentiary foundation is lacking. *See Gass,* 135 U.S.App.D.C. at 19, 416 F.2d at 775. However, nothing in the *Gass* decision suggests that a preliminary ruling would be required before cross-examining a party in an effort to establish a basis for a missing witness argument or instruction about claimed witnesses disclosed during trial.

Subsequently, the holding in *Gass* evolved here into the rule that it is error for the prosecutor to suggest to the jury through cross-examination that the testimony of a missing witness would have been adverse. *Chappell v. United States,* 519 A.2d 1257, 1259 (D.C.1987); *Sherrod v. United States,* 478 A.2d 644, 654 (D.C. 1984). This rule prevents counsel from suggesting through questioning what he or she is precluded from arguing without laying the proper foundation and obtaining an advance ruling from the court on the adequacy of the evidentiary predicate. Cross-examination which simply explores the existence and peculiar availability of a witness to the adverse party, essentially foundation questioning which is not phrased in a manner suggesting that the absent witness' testimony would have been unfavorable, is not precluded under *Chappell* and *Sherrod.* In my view, the challenged cross-examination here did not exceed these bounds.

Of course, this court has also held that it is error, without prior court approval, to make an incomplete missing witness argument to the jury, i.e. one which notes the absence of the witness without urging the adverse inference. *Arnold v. United States,* 511 A.2d 399, 416 (D.C.1986). The rationale for the holding is said to be that essentially such an argument ordinarily is one which suggests that the jury may conclude that the testimony would have been adverse to the party who fails to call the witness. *Id.* Again, the prohibition is against only arguments having the effect of suggesting the adverse inference. Prior court approval under these circumstances is deemed to assure that the foundational requirements are met and the propriety of the argument ruled upon before adverse inferences are suggested to the jury through argument. *Id.* It is for the court to determine in the first instance whether the jury can appropriately deduce the adverse fact from the evidence,[1] retaining the discretion to permit the argument or instruction on the adverse inference even if the two preconditions for it are met. *Price*

---

1. If the missing witness instruction is given, the jury determines ultimately whether a witness who could have elucidated the transaction was peculiarly available to a party and whether his absence was sufficiently accounted for before deciding whether to infer that the testimony of the witness would have been unfavorable. See Criminal Jury Instructions for the District of Columbia, No. 2.41 (3d ed. 1978).

*v. United States*, 531 A.2d 984, 993 n. 16 (D.C.1987); *German v. United States*, 525 A.2d 596, 611 (D.C.1987), *cert. denied*, 484 U.S. 944, 108 S.Ct. 331, 98 L.Ed.2d 358 (1987). Cross-examination which simply probes the existence and availability of witnesses suggested by a defendant does not create a presumption or unfairly suggest an adverse inference to the jury. Thus, the rationale underlying *Arnold* does not command a preliminary ruling under those circumstances.

Although we took the *Gass* and *Arnold* rules a step further in *Price, supra*, 531 A.2d 984, one step too far in my opinion, the *Price* decision again found error only in cross-examination which suggests "that the missing witnesses would have provided unfavorable testimony." *Id.* at 994. In *Price*, the questioning went beyond typical foundation questions. In questioning and final argument, the prosecutor suggested that the absent witnesses, who could provide the only corroboration for Price's alibi, were available and, in the court's view, suggested an adverse inference. *Id.* at 993.[2] The prosecutor did not go so far in this case. Rather, he sought to ascertain whether appellant knew the name, address or how to locate the claimed witness, and whether he made an effort to get them to court.

In my opinion, the potential harm associated with an incomplete missing witness argument is not present when proper foundation questions regarding the existence and availability of witnesses are posed during cross-examination.[3] On the other hand, a defendant, prosecutor or other party who interjects in testimony a previously undisclosed witness opens the door to inquiry about the claimed witness' existence and availability. To leave such disclosures immune from the test of cross-examination, absent exceptional circumstances, will more likely leave the impression with the jury that claimed witnesses exist who corroborate the events as portrayed by the testifying party, thereby unfairly prejudicing the other side. Since such questioning is within the permissible limits of cross-examination, special permission should not be required to conduct it. The requirement that such foundational questions be previewed unnecessarily undermines the means by which the witness' credibility is tested during cross-examination. *See In re W.A.F.*, 407 A.2d 1062, 1067 (D.C.1979); *see also Letsinger v. United States*, 402 A.2d 411, 415 (D.C.1979). Such preliminary reviews unduly restrict the spontaneity of answers elicited during cross-examination and, therefore, should be required only when necessary to avoid placing excludable evidence before the jury.

Evidence bearing on the existence and availability of potential witnesses mentioned by a party during cross-examination is not generally excludable on evidentiary grounds. In requiring a prior ruling on such questioning, we have come a long way from the *Gass* rule and the sound reasoning supporting it. *See Gass, supra*, 135 U.S.App.D.C. at 19, 416 F.2d at 775. It is a distance the federal circuits have not gone.[4] In characterizing such questions as even harmless error, the grounds are laid for

---

**2.** In *Price*, the trial court ultimately denied the missing witness instruction because the three missing witnesses were equally available to both sides. *Price, supra*, 531 A.2d at 992.

**3.** That is not to say that there will not be circumstances under which a prior ruling might be required to avoid undue prejudice (*e.g.*, missing witnesses having potential privilege). Under such circumstances, a preliminary examination and ruling can be obtained as in the case of other potentially excludable, prejudicial evidence.

**4.** A search for cases in the federal circuits which extend the *Gass* rule to advance rulings on foundation questions was unavailing. In the federal circuits, comments on a defendant's failure to

call witnesses are analyzed in terms of whether the comments implicate the defendant's right to remain silent or constitute an effort to shift the burden of proof. *See United States v. Johnson*, 713 F.2d 633, 651 (11th Cir.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984); *United States v. Hager*, 505 F.2d 737, 740 (8th Cir.1974); *United States v. Gotchis*, 803 F.2d 74, 81 (2nd Cir.1986). The prosecutor is free to comment upon the defense's failure to call any witnesses so long as the comments are not subject to interpretation as a comment on the defendant's failure to testify. *Gotchis*, 803 F.2d 74; *see also United States v. White*, 794 F.2d 367, 370 (8th Cir.1986).

repetitive revisitation of the issue in future cases. In my opinion, the preview required before foundational questioning goes far beyond what is necessary to meet the potential harm sought to be averted in *Chappell* and *Sherrod* or to assure a fair trial to both sides. Therefore, I respectfully dissent from that portion of the opinion which holds that an advance ruling must be obtained from the court before cross-examining a witness to lay a foundation for a missing witness argument or instruction where that questioning does not suggest that an adverse inference may be drawn from failure to produce the witness.[5]

ROGERS, Chief Judge, with whom MACK, Senior Judge, joins, dissenting:

On two prior occasions, the en banc court has defined plain error. *See Allen v. United States*, 495 A.2d 1145 (D.C.1985) (en banc); *Watts v. United States*, 362 A.2d 706 (D.C.1976) (en banc). Thus, the government agrees that plain error occurs when "the error complained of [is] so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts, supra*, 362 A.2d at 709. It further agrees that the plain error rule applies to "a trial infected with error so 'plain' the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." Appellee's petition for rehearing en banc at 2 (quoting *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). In my opinion the proper application of this test requires reversal here.

The majority concludes that the prosecutor's "impropriety" in violating the missing witness rules was insufficient to warrant reversal. In order to reach this conclusion

the majority underestimates both the gravity of the error in this case and the error's importance to appellant's trial and to the judicial system as a whole. In view of long-standing decisions of the court, the prosecutor's misconduct was clear. Yet the trial judge inexplicably failed to correct the situation. Furthermore, defense counsel's failure to object was unprofessional. This combination of circumstances virtually compels the conclusion that appellant's trial can only be characterized as a "miscarriage of justice." Under such circumstances, the court should find plain error both because the error had an "unfair prejudicial impact on the jury deliberations" and because the errors "seriously affect[ed] the ... integrity or public reputation of [the] judicial proceedings." *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936). The failure to do so here leaves the plain error doctrine with little meaning. Therefore, I respectfully dissent.

I.

According to the majority, the prosecutor's misconduct[1] in the instant case was failing to ask the trial judge's permission before cross-examining appellant in a manner that raised missing witness inferences. I agree that the prosecutor clearly erred in failing to seek the trial judge's permission before cross-examining appellant about whether he had asked missing witnesses to come to court to testify on his behalf.[2] The majority concludes, however, that this error was relatively unimportant, because if the prosecutor had sought the trial judge's permission, "it would have been within the trial court's 'considerable discretion' to allow [the] cross-examination." Majority

---

**5.** To the extent that *Price, supra*, 531 A.2d 984 is subject to an interpretation to the contrary, in my opinion the en banc court should overrule it.

**1.** Although the majority refers in this case to the prosecutor's alleged "impropriety," I retain the court's long-standing tradition of referring to "prosecutorial misconduct." *See, e.g., Gray v. United States*, 589 A.2d 912, 916 (D.C.1991) (describing general approach in cases of "prosecu-

torial misconduct"); *Hammill v. United States*, 498 A.2d 551, 554 (D.C.1985); *Sherrod v. United States*, 478 A.2d 644, 655 (D.C.1984); *United States v. Harvey*, 392 A.2d 1049 (D.C.1978) (en banc).

**2.** *See Lemon v. United States*, 564 A.2d 1368, 1375 (D.C.1989); *Price v. United States*, 531 A.2d 984 (D.C.1987); *Chappell v. United States*, 519 A.2d 1257, 1259 (D.C.1987).

opinion at 163 (quotation omitted). I cannot agree.

Before raising a missing witness inference, the party must demonstrate "(1) that the witness in question is peculiarly available to the party against whom the inference is sought, and (2) that the witness' testimony would have elucidated the transaction at issue." *Lawson v. United States*, 514 A.2d 787, 789 (D.C.1986). The purpose of this rule is to prevent the jury from being exposed to an argument that "may add a fictitious weight to one side or another of the case...." *Arnold v. United States*, 511 A.2d 399, 415 (D.C.1986) (quoting *Burgess v. United States*, 142 U.S.App. D.C. 198, 206, 440 F.2d 226, 234 (1970)).

During the cross-examination of appellant, the prosecutor asked appellant how he arrived at the scene of the arrest:

> Q [by the government]: And how did you get there?
>
> A [by appellant]: I walked.
>
> Q: From where?
>
> A: Walked from I say 9th to—it was over by the Florida Avenue Grill visiting a friend and I walked from there. That would be at 11th and Florida Avenue.
>
> Q: What time were you visiting your friend?
>
> A: I say around about 11:30, maybe quarter to 12:00.
>
> Q: Do you still know that friend?
>
> A: Yeah.
>
> Q: Did you ask—*did you try to see if you could get that friend to come in here and testify?*
>
> A: Yes, I did but they don't want to be—like, okay, I even seen one of the guys that I was gambling with but they don't want to get caught up in no cases whereas they might can get another charge for testifying or they don't want to be able to like—like no police to see them where they could can have to be like harassing them. Because the police harass people.
>
> Q: I'm not sure I understand. *You mean that your friends wouldn't testify because they have prior criminal records?*

> A: They wouldn't testify. I'm saying I just got caught up in something, you know, and I got to deal with it. They wouldn't testify for me.
>
> Q: *Is that because they have prior criminal records?*
>
> A: I have no knowledge of that. [Emphasis added]

This questioning clearly violated the missing witness rules because the prosecutor failed to obtain prior permission from the trial judge. *See* note 2, *supra.* More important, even if the prosecutor had asked permission, the judge would have to have denied it. The "Florida Avenue Grill friend" observed appellant hours before the drug sale and many blocks away. It is arguable whether the witness could have offered even *relevant* testimony; the witness surely could not have offered testimony that would "elucidate the transaction." *See Dyson v. United States*, 418 A.2d 127, 131 (D.C.1980) ("appellant's testimony was that he was with ... friends earlier on the night of the incident observing a fire some one to two blocks from the warehouses. [T]heir testimony ... would have shed no light on whether appellant did or did not break into the warehouse later that evening"); *Haynes v. United States*, 318 A.2d 901, 902 (D.C.1974) ("[t]he absent witness here ... was present at the door of the house, where she allegedly lived, shortly before the officers first encountered appellant.... We cannot see in what manner she could elucidate that transaction which is the subject of this prosecution").

The prosecutor's questions thus did exactly what the missing witness rule is designed to prevent: they suggested that the jury draw an improper adverse inference from the Florida Avenue Grill friend's absence at trial. *See Lemon, supra,* 564 A.2d at 1375 ("even where no adverse inference is expressly requested, the effect of the 'incomplete' argument is substantially the same as that of a more explicit one"). As our decisions make clear, the fact that the Florida Avenue Grill friend did not testify at trial proves only that he had

nothing important to add to appellant's defense.[3]

The prosecutor went on, during appellant's cross-examination, to question appellant about another missing witness:

Q [by the government]: Well, who were you playing dice with?

A [by appellant]: I was playing dice with some guys that play, you know, we play regular around the area.

Q: Well, you said you knew some of them, what were their names?

A: One was Raymond Jones.

Q: Where does Raymond Jones live?

A: I do not know his address.

Q: You don't know his address?

A: No.

\* \* \* \* \* \*

Q: And you—you only knew one person?

A: I only knew one person.

Q: And you tried to get him come down here and testify?

A: Uh-uh, I just seen him. I talked to him when I was out the last time on the street.

Q: When was that?

A: Back in May.

Q: And what did he say?

A: He said he couldn't come for me.

Q: Why is that?

A: Because they just won't come to court, man. I don't know why, they just—I mean, you know, if you get caught up, you just gotta deal with it the best way it is, the best way you can. That's the way it is.

This questioning was equally flawed, both because the prosecutor failed to ask for prior permission, *see* note 2, *supra,* and because permission would not have been granted. In particular, the government did not show that Raymond Jones was "peculiarly available" to appellant.

The court in *Carr v. United States,* 531 A.2d 1010, 1012–13 (D.C.1987), made clear that a witness is "peculiarly available" to the defendant if the witness is "physically unavailable" or "practically unavailable" to the government. "We have held that a witness can be peculiarly available when 'physically available' to only one of the parties, for example, to a defendant, but beyond the subpoena power of the government . . ." *Id.* at 1012 (citation omitted). In addition, a witness can be "practically unavailable" if one "party's ability to produce the witness, or his reasons for doing so, [are] stronger than those of the party seeking an inference in his favor. . . . [I]f a party has a special relationship with a witness, that witness becomes unavailable in a practical sense to the opposing party because his testimony is expected to be hostile." *Id.* at 1013 (quoting *Thomas v. United States,* 447 A.2d 52, 58 (D.C.1982); *Dent v. United States,* 404 A.2d 165, 170 (D.C. 1979)).

Applying these principles, it becomes clear that the government failed to demonstrate that Raymond Jones was peculiarly available to appellant. First, the government failed to demonstrate that Jones was physically available to either party. Harris gave uncontradicted testimony that he did not know where Jones lived, and that Jones would not testify voluntarily. Furthermore, to the extent that Harris could use compulsory process to bring Jones in, the government had the same option. Moreover, the fact that Jones was described as a "friend" of Harris is not enough to show that Jones was practically unavailable to the government. *Carr, supra,* 531 A.2d at 1014 ("Friends testify against other friends. That relationship alone cannot justify the missing witness instruction, at least without further exploration"). Thus, the government made no showing of unavailability.

The majority's conclusion to the contrary distorts the missing witness rule by requiring a defendant—the party against whom the inference is raised—to *disprove* the appropriateness of the inference. As our decisions make clear, however, the party raising the inference—in this case, the

---

**3.** Contrary to the majority's speculation that the jury would not attach much importance to this witness' absence, see majority opinion at 163, the import of the prosecutor's cross examination invited the jury to think that appellant's friend would have something to offer at trial.

government—is obliged to "establish the two foundation conditions to the court's satisfaction." *Carr, supra,* 531 A.2d at 1012 (quoting *Simmons v. United States,* 444 A.2d 962, 964 (D.C.1982)). Although the majority refers to "the government's argument that Raymond Jones was peculiarly available to [appellant]," majority opinion at 163, the majority's focus on the inadequacy of appellant's "response," majority opinion at 162–163, is misplaced. The government had the burden of demonstrating that the inference was justified; because the government failed to meet its burden, appellant had no obligation to make a "bona fide reasonable effort[ ] to produce the witness...." Majority opinion at 163 (quoting *Thomas v. United States,* 447 A.2d 52, 57 (D.C.1982).[4] Appellant did not need to respond, because the government never made a sufficient showing. Moreover, the majority ignores appellant's testimony on redirect, which indicated that appellant had asked his attorney to subpoena the missing witnesses, but that his attorney could not locate them.[5]

In sum, I disagree with the majority's characterization of the prosecutor's error in this case. The majority concludes that the prosecutor's error was no more serious than an infraction in the children's game of "Mother, may I?" In my view, the error is far more serious. In addition to failing to ask the judge's permission, the prosecutor engaged in cross-examination that raised an improper missing witness inference: an inference that the trial judge, had he been apprised of the prosecutor's intentions, would have refused to permit. The jury was thereby exposed to an inference that

can carry "fictitious weight" and which this court has repeatedly declared off limits. See Part II, *infra.*

## II.

The question remains whether the prosecutorial misconduct warrants reversal. Because appellant's counsel did not object at trial, we must decide whether the errors constituted "plain error." In my view, reversal is warranted for two reasons.

## A.

First, the "error[s] complained of [were] so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts, supra,* 362 A.2d at 709. In *Thomas, supra,* the court made clear that "where the defendant's credibility is a key issue and the missing witness inference goes to that credibility, an improper argument or instruction will ordinarily require reversal." 447 A.2d at 59, quoted in *Lawson, supra,* 514 A.2d at 790; *see Simmons, supra,* 444 A.2d at 965; *Coombs v. United States,* 399 A.2d 1313, 1318 (D.C.1979). The court has pointed out, moreover, that "repetition is an important factor in determining the gravity of such misconduct...." *Parks v. United States,* 451 A.2d 591, 614 (D.C.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2123, 77 L.Ed.2d 1303 (1983); *Dent v. United States,* 404 A.2d 165, 172 (D.C.1979). If, however, there is overwhelming evidence of a defendant's guilt or of a tactical choice by the defendant, then the alleged error does not effect a "miscarriage of justice" requiring reversal of a conviction on ap-

---

4. The majority opinion quotes only part of *Thomas's* statement about "bona fide" efforts. *Thomas* actually stated that "if a party has made bona fide reasonable efforts to produce the witness without success, no adverse inference will be permitted." 447 A.2d at 57. Contrary to the majority's implication, *Thomas* did not hold that the inference will always be available against a defendant who has not shown that he made efforts to produce a witness. Indeed, nothing in *Thomas* undermined the general rule that the party who seeks to raise the missing witness inference has the burden of demonstrating the witness's peculiar availability to the other party.

5. The majority's statement that a trial judge should not be required to accept a defendant's testimony about efforts to locate witnesses, majority opinion at 163, is a little strange, given the posture of this case. Presumably the majority would be more satisfied if defense counsel had made representations to the trial judge about his efforts to locate the missing witnesses. Because the prosecutor failed to ask the trial judge's permission before raising the missing witness inference, however, counsel for the defense had no opportunity to make any representations.

peal. *See Allen v. United States*, 495 A.2d 1145, 1152 (D.C.1985).

Appellant's credibility was "all important to his defense." *Haynes, supra,* 318 A.2d at 903; *see Thomas, supra,* 447 A.2d at 60. His entire defense rested on the jury believing his testimony about his innocent behavior and his explanation of how the prerecorded $20 bill came to be found in the police cruiser. Some corroborative evidence was provided in the police transport log, which indicated that there was another run between the time appellant was picked up and his arrival at the police station.[6] Although three police officers testified for the government, only Officer Wallace was involved in the drug transaction; the other two relied on what Wallace told them. Wallace admitted that he never checked the alley where appellant claimed he had been playing craps and he had heard others on the street calling out "love boat" while selling drugs. He also could not produce any documentation to confirm the serial number of the prerecorded $20 bill that he had used; he claimed that it had been stolen from his car. When the prosecutor demonstrated how a handcuffed man could reach into either back pocket to discard a bill, appellant showed the jury that he had been shot in the back causing one arm to be paralyzed at the time of his arrest. The officers' explanation of the transport log, in view of what was and was not stated in the report, was hardly compelling. Moreover, the transport log contained neither a log notation of recovery of $20 nor a notation of a vehicle check after appellant had been taken out of it.[7] The record is unclear about how close appellant was seen to the brown paper bag on the sidewalk,[8] and

the discrepancies in appellant's testimony, noted by the prosecutor in his closing argument, were minor.

The government emphasizes that the testimony of the three officers corroborated each other, that the chain of custody of the cruiser was well-established, and that the trial judge instructed the jury that appellant was not required to produce any evidence and that the burden of proof never shifts. The jury is presumed to follow the instructions. *See Hairston v. United States,* 497 A.2d 1097, 1103 (D.C.1985). These arguments, however, overlook the centrality of the credibility contest at issue and the fact that the jury was never instructed about how, if at all, it should view the so-called evidence that appellant did not call his friend or Jones as a witness or otherwise corroborate his misidentification defense. Long ago this court made clear that the trial court should not permit the prosecutor to make continued comments inviting the jury to speculate on the reason for the witnesses' absence. *Conyers v. United States,* 309 A.2d 309, 313 (D.C. 1973). Here the prosecutor cross-examined appellant about two missing witnesses, once with respect to appellant's friend and again with respect to Jones. Further, having directed the jury's attention during cross-examination to the absence of individuals whose testimony could only have elucidated earlier events unrelated to the drug sale, the prosecutor proceeded to argue to the jury not only that appellant had failed to corroborate his misidentification defense, but that the testimony of the police officers was worthy of more belief because they put their careers and retirement on

---

6. The police transport log showed that the police cruiser had received an initial run at 1:20 p.m. to assist at 6th and O Streets, and that upon arriving at 1:24 p.m., the police were told to go to the 1800 block of 6th Street, arriving at 1:38 p.m. Appellant was picked up at 1:45 p.m., and it took between 10 to 15 minutes to get from the scene to the police station. According to the transport log, the police cruiser received a call for another run at 13th and H Streets at 1:45 p.m. Officer Washington testified that the 1:45 p.m. run was different from that involving appellant, and, contradicting what was stated in the transport log, that the reference in the log to

two defendants being transported to the First District occurred later; he also testified that no one else was in the back seat of the cruiser with appellant.

7. Officer Washington testified that he checked the car after appellant was taken out of it, and that he found the $20 bill behind the cushions.

8. Officer Mitchell testified that he found the brown paper bag on top of a railroad tie on a "hill" where appellant had been standing.

the line.[9] Appellant had no burden to produce any evidence, *see United States v. Alston,* 179 U.S.App.D.C. 129, 551 F.2d 315 (1976), and there was no evidence to support the comments about the policemen's careers and retirement. *See Toliver v. United States,* 468 A.2d 958 (D.C.1983). Coming in rebuttal closing argument made the misconduct more prejudicial to a fair trial. *See, e.g., Jones v. United States,* 512 A.2d 253, 257 (D.C.1986); *Powell v. United States,* 455 A.2d 405, 411 (D.C.1982); *see also Young v. United States,* 150 U.S.App. D.C. 98, 104, 463 F.2d 934, 940 (1972) (proper argument by the prosecutor when combined with improper argument "may actually escalate the impact of the improper, just as some truth may bait the hook for the impact of a partial lie or libel").

The trial judge did not indicate in any way to the jury that the cross-examination on the failure of appellant's friend and Jones to testify was improper, that the prosecutor's closing argument was improperly based on non-evidence, or that missing witnesses' testimony would have been of limited relevance to the issue of appellant's guilt. *See Conyers, supra,* 309 A.2d at 313; *see Young, supra,* 150 U.S.App.D.C. at 104, 463 F.2d 934. The general instructions to the jury that the arguments of counsel are not evidence and that the government had to prove appellant's identification beyond a reasonable doubt were insufficient to cure the harm. *See Logan v. United States,* 489 A.2d 485, 488 (1985); *Villacres v. United States,* 357 A.2d 423, 428 (1976); *Miller v. United States,* 444 A.2d 13, 16 (D.C.1982). Rather, portions of the judge's instructions in combination with the prosecutor's argument had the effect of highlighting points that the prosecutor improperly made.[10]

Nor is there any indication that defense counsel's failure to object was the result of a reasonable tactical decision. The government suggests that since appellant testified that there were several people on the street, defense counsel might have considered it tactically advantageous to have appellant explain on cross-examination why he was unable to present any of those people as defense witnesses. The record illustrates the fallacy of that argument here. Appellant's responses on cross-examination hardly support the inference that a tactical defense strategy was involved. In addition, if defense counsel had asked appellant on direct examination whether any of his friends or people in the crap game would agree to testify for him, it is highly unlikely that he would have asked questions associating appellant with criminals.

Accordingly, since the missing witness inference directly related to the issue of guilt, there were no curative instructions, the evidence consisted primarily of the word of Wallace against that of appellant, and nothing in the record suggests that defense counsel's failure to object was a tactical decision, I would hold that the errors jeopardized the fairness of appellant's trial and reverse.

### B.

Perhaps more important, reversal is also appropriate in order to preserve the integrity of the judicial system. While the judicial system is overburdened these days, and judges, prosecutors and defense coun-

---

9. The government's contention that, unlike *Price, supra,* 531 A.2d 984, where the defendant raised an alibi defense, the cross-examination here had no appreciable negative effect on the verdict is unpersuasive. A claim of misidentification implies that appellant was not present at the scene of the crime or that he was not the perpetrator. *Garris v. United States,* 559 A.2d 323 (D.C.1989). Here, as in *Price,* the missing witnesses could have confirmed appellant's testimony that he was playing craps and that another man was selling drugs, thereby bolstering his credibility which was the linchpin of his defense.

10. For example, the trial court instructed the jury that it could judge credibility on the basis of "whether the witness had been contradicted or corroborated by other credible evidence in the case." The instructions did not tell the jury not to give greater weight to the testimony of police officers simply because they were police officers, but did tell the jury that counsel had a duty to object to any evidence which they thought was not properly admissible, thus leaving open the possibility that, in the absence of any instruction to the contrary, some jurors may have thought the missing witness inference could be used to convict appellant.

sel may understandably be anxious to move the cases through the trial court, the system must nevertheless continue to function in a manner consistent with the fundamental right of a defendant to a fair trial. The court need not find evil motive by any participant to conclude that a trial did not live up to this standard. As the Supreme Court made clear in *Atkinson, supra*, 297 U.S. at 160, 56 S.Ct. at 392, a court may find plain error if the prosecutorial misconduct "seriously affect[ed] the ... integrity or public reputation of [the] judicial proceedings." The prosecutorial misconduct in the instant case follows a long line of similar cases of improper missing witness arguments.

In a series of cases beginning with *Arnold v. United States*, 511 A.2d 399 (D.C. 1986), the court has emphasized the danger of raising improper missing witness inferences. Prosecutors were repeatedly warned that cross-examination and argument which raised such an inference required advance permission from the trial judge, *Price v. United States*, 531 A.2d 984, 993–94 (D.C.1987); *Chappell v. United States*, 519 A.2d 1257, 1259 (D.C.1987), and that permission would only be granted if the government could show the inference to be justified. *See, e.g., Lemon, supra*, 564 A.2d at 1375. Thus, the cross-examination raising a missing witness inference should have raised a red flag to the prosecutor. *See Lemon v. United States*, 564 A.2d 1368 (D.C.1989); *Brown v. United States*, 555 A.2d 1034 (D.C.1989); *Singley v. United States*, 533 A.2d 245 (D.C.1987); *Carr v. United States*, 531 A.2d 1010 (D.C. 1987); *Price v. United States*, 531 A.2d 984 (D.C.1987); *Hinnant v. United States*, 520 A.2d 292 (D.C.1987); *Chappell v. United States*, 519 A.2d 1257 (D.C.1987); *Lawson v. United States*, 514 A.2d 787 (D.C.1986); *Arnold v. United States*, 511 A.2d 399 (D.C.1986). It also should have raised a red flag to the trial judge. *See Hammill v. United States*, 498 A.2d 551, 557 (D.C. 1985) ("[t]he trial court *sua sponte* should have instructed the jury that appellant was not required to call [the missing witness] and that a negative inference could not be drawn from his failure to testify") (cita-

tions omitted). *See also Young, supra*, 105 S.Ct. at 1043 ("a trial judge should deal promptly with any breach by either counsel"); *Viereck v. United States*, 318 U.S. 236, 248, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1943) (obligation to act *sua sponte* where remarks are highly prejudicial).

It is the combination of factors in appellant's case—a prosecutor violating a clearly established rule, the trial judge failing to respond, and defense counsel failing to object—that created a miscarriage of justice. A criminal trial depends on each of these participants doing their job. When all fail to do so, the integrity and reputation of the judicial system can only be diminished. Therefore, I would reverse.